THEODORE M. HAUER,

*vs.*

APPALACHIAN GAS CORPORATION, a corporation created by and existing under the laws of the State of Delaware.

*New Castle, June 6, 1933.*

*John Biggs, Jr., William H. Radebaugh,* of the firm of Chapman, Snider, Duke & Radebaugh, of New York City, *Francis Bohlen,* of the firm of Saul, Ewing, Remick & Saul, of Philadelphia, Pa., and *Edwin Morgan,* of the firm of Semmes, Bowen & Semmes, of Baltimore, Md., for the petitioning reorganization committee.

*Arthur G. Logan,* of the firm of Marvel, Morford, Ward & Logan, and *Philip C. Kemp,* of the firm of Simp-

son, Thatcher & Bartlett, and *Robert Pulleyn,* both of New York City, for receivers.

*James M. Malloy,* and *Joseph Glass,* of the firm of Glass & Lynch, and *Leslie Kirsch,* both of New York City, for objector.

*Edwin D. Steele, Jr.,* and *Glover Johnson,* of the firm of White & Case, of New York City, for underwriter.

*C. H. Fleming,* of Pittsburgh, Pa., was admitted *pro hac vice,* but took no active part in the hearing.

THE CHANCELLOR: The proposed reorganization is sought to be effected by a public sale of the assets at not less than an upset price, the purchase of the assets by the reorganization committee (if it is the successful bidder), and the transfer of the assets by the purchasers thereof to a new company in exchange for new securities which are to be allocated to the holders of the old securities on a designated basis. New money in the amount of two hundred and fifty thousand dollars is to be secured by the new company upon terms set out in the reorganization plan and the application to be made of that money is provided for in the plan.

The objector concedes that so far as the allocation of the new securities to the holders of the old ones is concerned, the plan is free from objection.

The major points of attack made by the objector against the granting of an order of sale in order that the opportunity may be afforded of putting the plan into operation, revolve around the item of two hundred and fifty thousand dollars of new money which is to be obtained for the purpose and in the manner set out in the plan.

Objections are made first to the manner in which it is proposed to apply the two hundred and fifty thousand dollars of new money. If the sum is raised and added to the adjusted net cash in the hands of the receivers, the total

cash available for the consummation of the reorganization will be five hundred and sixty-three thousand, two hundred and ninety-one dollars. The committee has prepared an itemized budget showing the charges which, if the plan goes through, will be defrayed out of this sum. That budget totals $491,780.63. I do not find it necessary to comment upon some of the objections directed against certain of the items in this budget, because to discuss the objections referred to would involve the spending of a long length of time which the merits of the objections do not seem to me to justify. I do wish to refer to one objection, however, upon which the objector has laid special emphasis. I refer to the item of $59,342.51 accrued interest and $107,438.12 on account of principal, which are proposed to be paid to The Pennsylvania Company for Insurances on Lives and Granting of Annuities as the holder of the insolvent's collateral note in the face amount of $802,438.12. It is said that the proposed payment to the Pennsylvania Company constitutes a preference and should therefore not be permitted. That the payment would constitute a preference is true if the transaction were looked upon as the bare one of applying funds out of the general funds of the receivership in a *pro tanto* liquidation of the Pennsylvania Company's claim. But the transaction is not to be regarded as one simply of that character, for the Pennsylvania Company holds collateral as security for its note, some of which, viz., 94,736 shares of Memphis Natural Gas Company's stock appears to be highly desirable to be retained in the ownership of the reorganized company. It also holds other collateral. It is therefore in a position to foreclose the pledged collateral and in case the proceeds derived therefrom should yield less than the note and interest (which at the present market is almost certain to be the case) to participate as a general creditor to the full extent of its claim in the proceeds of all the free assets of the insolvent, in no event of course receiving

from all sources more than the amount of its claim. *Central National Bank v. Bateman & Companies, Inc.*, 15 *Del. Ch.* 31, 131 *A.* 202; *Mark v. American Brick Co.*, 10 *Del. Ch.* 58, 84 *A.* 887. That being the situation, it is at once apparent that the proposed adjustment with the Pennsylvania Company is to be regarded not as the favoring of one creditor over others standing in an equal equity; but rather as the adjustment of the claim of a secured creditor for the general advantage of all the unsecured ones, the adjustment being such as to deprive the secured creditor of the tactical advantage which the possession of an enforceable lien yields and the consequent saving to the general estate of the value which the equity in the collateral is believed to possess. I shall not dwell upon the details of the settlement which the plan proposes to be made with the Pennsylvania Company. It is sufficient to say that it seems to me to be founded in business prudence. I therefore decline to refuse an order of sale because of the settlement with the Pennsylvania Company which the committee (if it is the purchaser) proposes to effectuate.

It is next said that there is no necessity of securing· an underwriting of $250,000 and for the payment to the underwriter· of the substantial consideration therefor as the plan proposes. In this connection it is asserted by the objector that there are cash resources within the receivership which can be tapped without turning to outsiders. These internal sources consist of cash in the possession of the insolvent's subsidiaries. As to the amount of cash which can be safely passed up to the insolvent parent company from its subsidiaries consistently with the continued welfare of the subsidiaries, there is a wide difference of opinion. The objector claims that as much as $263,000 may be so passed up; the committee, in whose judgment the receivers concur, claim that not more than $82,000 at the outside could with safety be drawn from the subsidiaries. Certainly the drawing of funds from subsidi-

aries in crippling amounts in aid of their hopelessly insolvent top holding company, cannot be justified. I am unwilling on the showing made before me to say that not only the committee which represents such an overwhelming majority in interest of the real owners of this group of companies, but as well the receivers, are wrong in their view that it would be undesirable as a business proposition to look to the cash avails of the subsidiaries for the funds necessary to a reorganization of their insolvent parent.

I now turn to the objection that the underwriter is to be overpaid. Of course it is not to be expected that when a badly collapsed enterprise seeks aid from the outside to assist in its rehabilitation, it can hope to receive it at a modest cost. It is unfortunate that in the coldly practical world of finance desperation of need is the accepted opportunity for liberality of recompense. The committee recognized this fact and so, in order if possible to save the debenture holders, upon whom insolvency had cast the equitable ownership of the assets, from the burden of compensation to the supplier of the new money in the amount of $250,000, it arranged with the proposed underwriter that he would admit the debenture holders to a participation in the proceeds of the underwriting provided twenty-five per cent. of the debentures elected to purchase a share in the underwriting on a *pro rata* basis. After being advised of this opportunity, only two per cent. of the debentures expressed a desire to avail themselves of it. The case is therefore one where the real parties in interest were afforded an opportunity to avoid the burden of what is now claimed by the objector to be too high a cost for new money. Whether the objector was willing to make her *pro rata* purchase in the underwriting, is not shown. The terms of her contract with her solicitors under which they undertook to represent her in the matter of the present objections, are such as lead me to believe that she did not. The case is not one where the equitable owners

were given no opportunity to finance their own necessities. They were not excluded from an allegedly favorable underwriting opportunity and its supposed advantages conferred to their injury upon a selected stranger.   The vast majority of the debenture holders in substance expressed themselves as unwilling to participate in the underwriting on the terms proposed and, by action in place of words, said "We prefer that the underwriter should make the investment alone."   When it is considered that $12,635,500 debentures are outstanding with the public and that only $250,000 in cash was to be raised, it is apparent that the contribution to be made by each $1,000 of debentures in order to raise the needed sum was relatively light.   Yet only two per cent. of the debentures expressed a willingness to make it.   In the face of the virtual consent of over eleven million dollars of the debentures, expressed in a very emphatic way, that the terms of the underwriting are not unfairly liberal to the underwriter, I am asked to accept the contrary view of the holder of only $194,000 of the debentures that the terms are so unfair as to warrant the rejection of the entire reorganization plan.   There is no hint of an ulterior interest designed to be served by the underwriting arrangement—no intimation of the slightest kind of a vitiating motive as its inspiration.   The company must be either reorganized with some saving of opportunity to its security holders to recover at least a part of their loss, or thrown under the auctioneer's hammer and disposed of at destructively sacrificial prices for its assets.   Reorganization is decidedly the preferable alternative.   Accepting the view that the new money is a prerequisite to a reorganization, I am of the opinion that the proposed method of securing it should not be rejected, especially in view of the demonstrated attitude of the overwhelming majority of the real parties in interest as above set forth.

It is next objected that the proposed upset price of

$825,000 is too low. The objector takes a line of argument under this head which if I were to pursue and discuss in detail would carry this memorandum to an inordinate length. The argument deals with appraisals and estimates and a rather elaborate discussion of figures of value arrived at by a selected formula for giving to estimated future receipts of sundry subsidiaries a present dollar value. The argument is too dependent for its soundness upon speculation and what seems to me to be elusive theory, to be accepted as a justification for fixing such an upset price as the objector contends for—a price that I am convinced that the assets can never, within any such time as this receivership could be reasonably expected to be kept open, sell for. I think the suggested upset price of $825,000 should be accepted. It is as much as the committee representing the true owners of the assets, not a stranger, is willing to offer, and one which the receivers after a year of close contact with the enterprise recommend as reasonable.

What is the alternative, if the prayer of the petition is denied? The answer, I think, is plain. It is that the present plan of reorganization upon which so much time and effort have been expended will be totally disrupted. The Pennsylvania Company, which after considerable negotiation was persuaded to forego its potentially dominating, and so far as the insolvent is concerned its tactically destructive, position, will be free to insist on its legal right to sell the collateral held by it (doubtless to itself) at a sacrificial price and, after having done so, participate jointly with other creditors as a general claimant for over one million dollars of debt, as before pointed out. The net result will be that the whole structure of the enterprise in which the money of the debenture holders has been invested will fall in ruins and its assets disposed of at extremely sacrificial prices to bargain hunters. The debenture holders will be practically stripped of their entire

investment, as contrasted with the opportunity, which the plan affords, of going along with the enterprise in its reorganized form.

The objector appears to entertain the view that this court can carry the receivership along into the indefinite future and hold the Pennsylvania Company back from asserting its legal rights against the collateral which it holds in pledge. I do not concur in that view. I am convinced that if the opportunity is denied the petitioners to consummate the pending plan, the inevitable result will be a scrapping and junking operation. I am unwilling to countenance that sort of result as an acceptable one.

The only alternative to the present plan which the objector suggests is the one of *laissez faire*. That alternative, does not appeal to me. The prayer of the petition will therefore be granted.

I observe from the plan that the time has expired within which holders of debentures and stock may make deposit of their holdings for the purpose of participating in the plan's operation. The order directing the sale will contain a proviso that such holders who have not deposited their debentures and stocks within the time limited for deposit, shall have an extension of time for deposit to a designated date, to the end that they, particularly the non-depositing debenture holders, may yet participate if they care to do so instead of being compelled to take their money share of the proceeds of the sale.

Order in accordance with the foregoing.