## COMMONWEALTH & SOUTHERN CORPORATION v. SECURITIES AND EXCHANGE COMMISSION.

### No. 8052.

Circuit Court of Appeals, Third Circuit.
Argued Oct. 23, 1942.

Decided March 31, 1943.

George Roberts, of New York City (John C. Weadock and Hayden N. Smith, both of New York City, and Joseph S. Clark, of Philadelphia, Pa., on the brief), for petitioner.

Robert M. Blair-Smith and John F. Davis, both of Philadelphia, Pa. (Homer Kripke, Asst. Solicitor, Roger S. Foster, Counsel, Public Utilities Division, Maurice C. Kaplan, and Arnold R. Ginsburg, all of Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, MARIS, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

The Commonwealth & Southern Corporation is a Delaware corporation duly registered as a public utility holding company under section 5 of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq. Its principal assets consist of the common stocks of ten public utility subsidiaries engaged, inter alia, in the business of furnishing electricity and gas. These subsidiaries are located within the states of Michigan, Illinois, Indiana, Ohio, Pennsylvania, Alabama, Georgia, Mississippi, Florida and South Carolina. Except for the electric properties of the southern subsidiaries which are interconnected with each other and the electric properties of the Ohio subsidiary which are interconnected with the Pennsylvania subsidiary there is no physical interconnection between the subsidiaries.

Commonwealth's debt and capital structure as of October 31, 1941 consisted of

| | | |
|---|---|---:|
| (1) | bank loans | $ 13,000,000.00 |
| (2) | 1,500,000 shares of $6 cumulative preferred stock without par value, carried in Commonwealth's books at | 150,000,000.00 |
| (3) | Accumulated dividend arrearages upon the preferred stock | 31,117,758.00 |
| (4) | 33,673,328 shares of common stock without par value, carried in Commonwealth's books at | 168,366,640.29 |
| (5) | option warrants entitling the holders to purchase at $30 per share 17,588,956 shares of common stock | |

The holders of the preferred stock are entitled to be paid, when and as declared by the board of directors, dividends of $6 per share per annum before any dividends are paid upon the common stock. Unpaid dividends are cumulated without interest. Since 1934 only one-half of the preferred dividends has been paid, the remaining one-half having been accumulated at the rate of $4,500,000 each year. Since 1932 no dividends have been declared or paid on the common stock. The holder of each share of preferred and of each share of common has one vote per share.

On March 6, 1940 the Securities and Exchange Commission instituted integration proceedings under section 11(b) (1) of the act. On March 19, 1941, it filed tentative conclusions as to what it found to be the single integrated public utility system of Commonwealth. These conclusions were put at issue by Commonwealth. On April 8, 1941 the Commission instituted simplification proceedings under section 11(b) (2)

750

of the act. These proceedings were given precedence by the Commission over the integration proceedings. On May 1, 1941 Commonwealth filed an answer in the simplification proceedings and on July 2, 1941 Commonwealth filed a supplemental answer in both proceedings. It thereby proposed a plan which provided for the retention by Commonwealth of its southern group of subsidiaries as a single integrated system. Commonwealth was to offer the common stocks of its northern group of subsidiaries in exchange for the outstanding shares of its preferred stock. If all the holders of preferred stock accepted the offer all the preferred stock would thereby be retired. Commonwealth claims that the plan thus would achieve the objectives of both the integration and simplification proceedings. No action has as yet been taken by the Commission on this plan. On April 9, 1942 the Commission entered its simplification order and on May 15, 1942 denied by order Commonwealth's petition for rehearing. Both orders are now under review. The Commission scheduled hearings on the issues raised in the integration proceedings for June, 1942, and ordered that evidence be taken at these hearings upon Commonwealth's plan and any other plan submitted by duly qualified persons at these hearings. These issues are still undecided.

The order which Commonwealth has brought here for review was entered under the provisions of section 11(b) (2) of the act, 15 U.S.C.A. § 79k(b) (2). That section, in so far as here pertinent, provides that it shall be the duty of the Commission, as soon as practicable after January 1, 1938 "To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders, of such holding-company system."

The Commission found that the corporate structure of Commonwealth unduly and unnecessarily complicates the structure of its holding company system as a whole and unfairly and inequitably distributes voting power among security holders of the holding company system. It also found that the elimination of all pre-

ferred stock and the resultant reduction of Commonwealth's corporate structure to a single class of common stock was a step necessary to ensure against both evils. It thereupon entered the order here under review, the pertinent part of which reads: "It is Hereby Ordered, pursuant to Section 11(b) (2) of the Public Utility Holding Company Act of 1935 and in accordance with said findings and opinion, that the Commonwealth & Southern Corporation shall change its present capitalization to one class of stock, namely, common stock, in an appropriate manner, not in contravention of the applicable provisions of said Act or the rules, regulations and orders promulgated thereunder; provided, that its present funded debt may be liquidated according to its terms without acceleration other than such acceleration as may be found practicable from time to time and as shall not be in contravention of the applicable provisions of the Act or the Commission's rules, regulations and orders promulgated thereunder."

It is not claimed by Commonwealth that there is not substantial evidence to sustain the findings by the Commission that the corporate structure of Commonwealth unduly and unnecessarily complicates the corporate structure of the entire holding company system and that the voting power is unfairly and inequitably distributed among security holders of the holding company system. Indeed, there is tacit acceptance by Commonwealth that these findings are based upon substantial evidence as may be gathered from its supplemental answer in which it presents its own plan for simplification. Commonwealth contends, however, that the order should be set aside because it is not authorized by the statute; because Section 11 of the act, if construed so as to authorize such an order, is unconstitutional; and because the proceedings which terminated in the order were objectionable.

I. The contention that section 11(b) (2) does not warrant the order.

■ Commonwealth urges that the order in the form in which it was entered is not justified by the language of section 11(b) (2) of the act. This contention requires us to consider the congressional purpose and the language used to carry out that purpose. What Congress evidently sought was the simplification of those holding company systems whose corporate complexities it found had had an undesir-

able effect upon interstate commerce. In section 11 Congress provided the machinery to be used in achieving that end.

Subsection (a) of section 11 provides for essential preliminary studies by the Commission of each registered holding company and subsidiary to determine the extent to which the holding company system may be simplified, unnecessary complexities eliminated, voting power fairly and equitably distributed and the properties and business confined to those necessary or appropriate to the operations of an integrated public utility system.

Subsection (b) of section 11 provides that after hearing and presumably in the light of its preliminary study the Commission shall require by order that the holding company and its subsidiaries take such action as may be necessary to bring about compliance with the standards set up by the subsection. The Commission's action may include both an integration and divestment order under subdivision (1) and a simplification order under subdivision (2). In the case of a simplification order the Commission must direct what step or steps the holding company is to take in order to bring its corporate structure and voting power in line with the standards of subdivision (2). But such an order is not self-executing and the act has accordingly provided two alternative methods of carrying it out.

The first of these methods is through a plan voluntarily submitted by the company under subsection (e) of section 11 and approved by the Commission. If the plan is one which can be carried out by the sole action of the parties thereto no further proceedings are needed. If not, the subsection authorizes the Commission, at the request of the company proposing the plan, to make application to a district court to enforce and carry out the plan. In this proceeding the court, if it finds the plan fair, equitable and appropriate, may direct it to be carried out, taking possession of the company and its assets if necessary to that end. The second method is provided by subsection (d) of section 11 which authorizes the Commission to apply to a district court to enforce compliance with the order. The subsection contemplates that in such a proceeding the court may direct compliance with the order through the carrying out by all parties in interest of a reorganization plan which the court finds to be fair and equitable

and which has been proposed by a party in interest and approved by the Commission or proposed by the Commission in the first instance. Here also the court is given power to take possession of the company and its assets if necessary to carry out the plan.

It will thus be seen that the congressional purpose is to leave open to the holding companies a broad area of discretion in determining just how they are to bring their systems into compliance with the required standards. The orders to be entered by the Commission under section 11(b) are fundamentally directions that the companies involved achieve a stated result in integration of operations, divestment of nonintegrated properties, simplification of corporate structure or distribution of voting power in order to meet the standards established by the section. While these orders are final and binding determinations of the result to be achieved it seems clear that Congress intended that the Commission might leave open for later consideration the detailed means by which the result directed should be accomplished.

It is obvious that in many cases the desired result may be reached in more than one way. Congress evidently intended to permit the Commission to leave to the company involved the initiative in suggesting from among the available alternative methods that one which it deems most appropriate. This seems clear in the light of the fact that under section 11(e) the company is not restricted to proposing a plan of compliance which it is in a position to carry out itself but it may also propose a plan affecting the rights of third persons which it may, through the Commission, request a court to enforce against the opposition of those third persons. It is only if the company does not propose a plan which the Commission and the court approve that the Commission under section 11(d) itself may propose and seek enforcement of a plan against the opposition of the company.

 Having examined the statutory scheme we pass to the consideration of Commonwealth's contentions in this regard. There are two of them. The first is that the order under review is fatally general in that it prescribes only the ultimate step required to be taken without pointing out the manner in which the required result is to be accomplished. It is clear from what has been said that this is

exactly the sort of order which section 11(b) contemplates. This particular contention is, therefore, wholly without merit. Commonwealth's other contention is that since the order requires that the company's present preferred and common stock be converted into a single class of common stock and since such a conversion requires the assent of the stockholders which the company itself has no power to secure, the order requires action on its part which is wholly beyond its power and is, therefore, invalid on that ground. But what we have said as to the statutory scheme is a complete answer to this contention also. For it is clear that Congress intended that the subject company should be given an opportunity, as is done by this order, to procure the voluntary assent of its stockholders to an appropriate plan or, if it is unable to procure such assent, to propose an appropriate plan to accomplish the result and to secure its enforcement by the district court as against nonassenting stockholders.

II. The contention that section 11(b) (2) is unconstitutional.

A. Alleged Unlawful Delegation of Legislative Power.

■ We turn next to the contention that section 11(b) (2) is unconstitutional if construed so as to permit the present order.[1] Commonwealth contends that the provisions of section 11(b) (2) constitute an unlawful delegation by Congress of legislative power in violation of sections 1 and 8 of Article 1 of the Constitution. This contention is based upon the premises that the act does not contain any declaration of policy with respect to the simplification of corporate structures and that it contains no intelligible standards to guide the Commission. Neither premise is sound.

Congress clearly expressed in section 1(c) the policy which motivated the act. It is to eliminate certain enumerated evils in public utility holding company systems engaged in interstate commerce or in activities which directly affect or burden interstate commerce. For the purpose of effectuating this policy Congress undertook, inter alia, "to compel the simplification of public-utility holding-company systems". The task of determining which companies require simplification and how that simplification is to be achieved is entrusted to the Commission. These decisions may be reached only in conformity to previously pronounced legislative standards and by methods carefully prescribed. The steps which the Commission orders the company to take must be such as are "necessary to ensure" that the company's corporate structure does not "unduly or unnecessarily" complicate the structure of the holding company system and that it does not "unfairly or inequitably distribute voting power." These standards are adequate to permit the Commission to carry out the policy of the act. Opp Cotton Mills v. Administrator, 1941, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624; Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 397, 398, 60 S.Ct. 907, 84 L. Ed. 1263; New York Central Securities Corporation v. United States, 1932, 287 U. S. 12, 53 S.Ct. 45, 77 L.Ed. 138.

In the Opp Cotton Mills case, supra, the standards expressly upheld as adequate were "the highest minimum wage rates for the industry which it [the industry committee] determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry". [312 U.S. 126, 61 S.Ct. 528, 85 L.Ed. 624.] In Federal Security Administrator v. Quaker Oats Company, 1943, 63 S.Ct. 589, 87 L.Ed. ——, the Supreme Court upheld the validity of regulations by the Federal Security Administrator as to milled products. The sole standard found in the Federal Food, Drug, and Cosmetic Act is "Whenever in the judgment of the Administrator such action will promote honesty and fair dealing in the interest of consumers." 21 U.S.C.A. § 341.

B. Commerce Powers.[2]

■ It may be conceded, as Commonwealth urges, that the right to exist as a corporation, the power to own and vote stock in subsidiary companies, the right

---

[1] For an interesting and timely discussion of this section see Manoff—Constitutionality of The Simplification and Voting Power Provisions of the Holding Company Act—16 Temple U.L.Q. 32 (1941).

[2] In North American Company v. Securities and Exchange Commission, 2 Cir., 1943, 133 F.2d 148, certiorari granted 1943, 63 S.Ct. 764, 87 L.Ed. ——, the Circuit Court of Appeals for the Second Circuit held that section 11(b) (1) of the Public Utility Holding Company Act of 1935 is a constitutional exercise of the power conferred by the commerce clause.

to issue stock having designated preferences, priorities, voting power and other rights, and the right to retire or redeem securities are all local matters, normally regulated by the laws of the state. It does not follow that Congress is restricted in the exercise of the commerce power because any or all of these rights are affected thereby. That is the fundamental weakness of Commonwealth's contention that if section 11(b) (2) is construed so as to permit an order which deals solely with the corporate structure of the holding company and the rights of the stockholders among themselves it is unconstitutional because outside the power conferred by the commerce clause. Such a contention takes entirely too narrow a view of the extent of the power conferred upon Congress by the commerce clause, for it is well settled that activities which are in themselves intrastate may be regulated by Congress if they affect interstate commerce. United States v. Darby, 1941, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; United States v. Wrightwood Dairy Co., 1942, 315 U.S. 110, 62 S.Ct. 523, 86 L. Ed. 726. It is immaterial whether the effect upon interstate commerce is direct or indirect if the activities exert a substantial economic effect on that commerce. Wickard v. Filburn, 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. ——.

Upon its consideration of the reports of the studies made by its committees and by the Federal Trade Commission Congress expressly stated in section 1 of the act its conclusion that the rates charged by operating public utility companies and the services which they rendered were adversely influenced by holding companies whose corporate structures were unduly complicated. Congress concluded that unduly complicated corporate structures of holding companies affected interstate commerce adversely. Congress having thus incorporated its conclusion in the act itself it is not for this court to make an independent study of the economic data upon which the legislative conclusion was based. In view of its factual conclusion Congress was acting well within its constitutional power to strike at the evil by any means which seemed to it to be appropriate and desirable. It follows, likewise, that it is not open for us to consider whether the complications of corporate structure which the Commission found to exist in Commonwealth's case do actually adversely affect interstate commerce. Since Congress

has found that such complications have adversely affected interstate commerce in many cases it is clearly within its power of policing that commerce to require the elimination of such complications in all cases.

C. Due Process.

In view of our conclusion that the order here complained of is within the commerce power Commonwealth's contention that the order violates the Fifth, Ninth and Tenth amendments necessarily fails. It is suggested by Commonwealth that the order is also in violation of the Fifth amendment with respect to its stockholders since it directs an alteration in their rights without their consent and without their having been heard. But without granting its validity we think that this point is premature. The order now under review, as we have pointed out, is primarily designed to enable Commonwealth to comply with the mandate of the law by obtaining the voluntary co-operation of its stockholders. If they do thus co-operate and adopt a plan which complies with the Commission's order obviously no question of want of due process can arise. On the other hand if a voluntary readjustment cannot be consummated and it becomes necessary to make application to a district court for the enforcement under sections 11(d) or 11(e) of a plan proposed by the Commission or the company the stockholders will have an opportunity to assert in the district court any objections, including want of due process, which they may have to the plan presented in so far as it affects their rights.

In Detroit Edison Co. v. Securities & Exchange Commission, 6 Cir., 1941, 119 F.2d 730, page 740, the court said: "The party who invokes the power to review and annul Acts of Congress must be able to show that he has sustained, or is immediately in danger of sustaining, some direct injury as the result of its enforcement. Until some order of the Commission adversely affects the petitioner a challenge to constitutional validity is premature." This rule is applicable to any claim of want of due process by the stockholders in the present case, for the order cannot be said to affect them as yet.

III. The contention that the hearings were unfair.

Finally Commonwealth asserts that it was deprived of a full and fair hearing, such as is provided for by the

statute and guaranteed by the Fifth Amendment to the Constitution. One of its objections is that the Commission rejected Commonwealth's proffer of testimony by a qualified expert as to the value of Commonwealth's assets, including the reproduction cost new and the reproduction cost new less depreciation of the physical properties of the subsidiaries and the prospective earnings. The stated purpose of this proffered evidence was to prove that the value of the assets was sufficient to support a substantial amount of preferred stock in Commonwealth's capital structure.

The immediate issue before the Commission, however, was whether the presence of preferred stock in Commonwealth's corporate structure unduly and unnecessarily complicated the corporate structure of the holding company system. Upon that issue the Commission found that Commonwealth's corporate structure was essentially unsound because the payment of the fixed dividend upon the preferred stock was wholly dependent upon receipt of dividends upon the common stock of the operating subsidiaries, which dividends were quite speculative because they were subordinated to heavy fixed charges which the subsidiaries were under obligation to pay upon their own senior securities. In the light of the system's record of earnings the Commission concluded that such a corporate structure did not measure up to the standards laid down by section 11(b) (2).

In reaching this conclusion the Commission took account of the fact that the debt and securities of the subsidiaries and the debt of Commonwealth, all of which were senior to Commonwealth's preferred stock, equalled 77.04% of the cost of the property of the system as reflected on its books and that the preferred stock equalled 20.19% of that cost, leaving but 2.77% thereof to represent the common stock. Commonwealth urges, and the Commission denies, that this was making use of evidence as to the value of the property and that Commonwealth should, therefore, have been permitted to offer its own evidence as to value. But we think that the Commission was justified in relying upon the ratio between capitalization and cost of property in fortifying the conclusion it reached from the earnings record of the system that the position of the preferred stock and particularly of the common was too precarious as to earnings to permit both to continue in a system which was to meet the requirements of section 11(b) (2).

The issue before the Commission did not involve a valuation of the company's assets for the purpose of determining the respective rights of participation therein of the various existing classes of securities. Such a valuation may, as the Commission points out, later become necessary and if so Commonwealth will have full opportunity to offer its evidence. The question involved in the present order is merely whether, in the light of the capital structure of Commonwealth's system, the continuance of any preferred stock will so burden and complicate the system in connection with its future financing and other operations as to run afoul of the standards of simplicity which section 11(b) (2) has set. That issue did not require a valuation of the system's property and we think that the Commission did not err in refusing to enter into the consideration of that question at this stage of the proceeding.

Commonwealth complains that its proposed plan was not considered at the hearing which led up to the order now under review. But proposals of detailed methods for securing the simplification of a corporate system can have no bearing upon the basic question whether simplification is in fact required to meet the standards laid down by section 11(b) (2). The opportunity to present the plan after the determination of that question is, as we have seen, amply safeguarded by section 11 and was in fact accorded Commonwealth by the Commission when it directed that evidence upon all plans, including that proposed by Commonwealth, be taken in the hearings in the proceedings under section 11(b) (1).

The final assignment of unfairness is based upon the fact that the Commission failed to consider the effect of any orders which may hereafter be made by it in the proceedings under section 11 (b) (1). There is, however, no direction in the act as to whether proceedings under section 11(b) (1) or under section 11(b) (2) should be first determined. The order of procedure is left entirely to the discretion of the Commission. We may not interfere with the exercise of its discretion in this case.

The order of the Commission is affirmed.