**In re SECURITIES AND EXCHANGE COMMISSION (OTIS & CO., Intervener).**

**No. 8463.**

Circuit Court of Appeals, Third Circuit.
Argued Dec. 23, 1943.

Decided April 20, 1944.

As Amended April 26, May 1 and May 24, 1944.

Arthur G. Logan, of Wilmington, Del. (Richard B. Hand, of New York City, on the brief), for appellant.

Roger S. Foster, Philadelphia, Pa. (John F. Davis, Homer Kripke, and John W. Christensen, all of Philadelphia, Pa., on the brief), for Securities and Exchange Commission.

Donald R. Richberg, of Washington, D. C. (John Dern, of Chicago, Ill., and Clarence A. Southerland, of Wilmington, Del., on the brief), for United Light & Power Co.

Before BIGGS, JONES, and Mc-LAUGHLIN, Circuit Judges.

BIGGS, Circuit Judge.

The appeal at bar presents for our determination the question of the meaning of the phrase "fair and equitable" contained in Section 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k (e). In view of the exhaustive opinion of the Commission,[1] those of its concurring and dissenting members and that of the District Court[2] it is unnecessary to include here an extended statement of facts for the questions before us are primarily those of law.

The United Light & Power Company, a solvent registered holding company, a Maryland corporation, is at the top of the United Light & Power Company system.[3] Immediately below "Power" is another registered holding company, the United Light & Railways Company. Most of the operating subsidiaries of the system are controlled by "Railways" and Power owns all of its common stock. The Commission has found that Power must be liquidated and dissolved in order to simplify the holding-company system as required by Section 11 (b) (2) of the Act, 15 U.S.C.A. § 79k(b) (2). Power has three classes of stock; a class A common, a class B common, and a class A preferred stock, the last being entitled to cumulative dividends. No issue is presented by the present review as to the rights of the common stockholders vis-a-vis each other. It is unnecessary, therefore, to describe these stocks except to say that the B common carries all voting rights in the company. Power's charter provides that on the dissolution or liquidation of the corporation whether "voluntary or involuntary" the holders of the preferred stock "shall be entitled to receive out of the net assets of the corporation, whether capital or surplus, for each share of such stock, one hundred dollars and a sum of money equivalent to all cumulative dividends on such share, both accrued and in arrears (whether or not the same shall have been declared or earned) including the full dividend for the then current quarterly period before any payment is made to the holders of any stock other than the * * * [preferred] stock in accordance with their rights at the time of distribution."

It is conceded that upon dissolution or liquidation of Power the preferred stock would have a principal claim of $60,000,000[4] and that accumulated unpaid dividends, as of December 31, 1942, amounted to $38,700,000, a total of $98,700,000. Power's principal asset consists of common stock of Railways.[5] It is also conceded by all the parties that the value of Railways' common stock does not amount to $98,700,000.[6] Power and Railways none the less sub-

---

[1] See SEC Holding Company Release No. 4215.

[2] See In re United Light & Power Co., D.C., 51 F.Supp. 217.

[3] There were fifty-two companies included in the system at the time of the hearings before the Commission. Seven of them were registered holding companies.

[4] The preferred stock issued and outstanding consists of 600,000 shares. These shares were issued in 1929 and 1930.

[5] Power has other assets which are to be used by it under the plan for the liquidation of certain obligations. The details of this part of the plan need not be set out here.

[6] Judge Leahy stated, 51 F.Supp. at page 221:
"If the dividend claim is capitalized as a matured obligation, the total claim of preferred will be $98,700,000. All parties agree also that the assets * * * have

414

mitted to the Commission joint applications and declarations for the approval of a plan which provided that the common stock of Railways should be distributed to the preferred and common stockholders of Power in the respective ratios of 91.2% and 8.8% and that Power should then be dissolved. The Commission held a hearing on this plan and issued an opinion disapproving the proposed allocation of Railways stock as too generous to Power's common stockholders, but found, Commissioner Healy vigorously dissenting, that a distribution of 94.52% and 5.48% to Power's preferred and common stockholders respectively would be fair and equitable. The plan was modified to accord with the Commission's opinion, was then approved by the Commission and was brought on for hearing before the District Court for the District of Delaware as provided by Section 11(e) of the Act[7] The court found that the plan was "fair and equitable" and entered an order approving it. The appeal at bar was taken by Otis & Co., a preferred stockholder, which had intervened in the proceedings before the District Court.

Certain apparent concessions made by the appellant disappear on examination. The Commission states in its brief that the only question which Otis & Co. has raised is the legal theory governing the allocations of the stock of Railways. This is not so in fact. In its brief the appellant "incorporates" and asserts the views of Commissioner Healy as set out in his dissenting opinion and those views cover almost every aspect of the case. The appellant therefore makes two major contentions which may be summed up as follows. First, it takes the position that the Commission is without authority to allocate to the common stockholders of Power any stock of Railways because the total value of that stock is insufficient to pay in kind the amount of the claims of the preferred stockholders of Power[8] as they will mature upon the liquidation of Power; that the phrase "fair and equitable"[9] being one of art, requires the application of the "absolute priority" rule of Case v. Los Angeles Lumber Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110,[10] and forbids the giving of any interest whatsoever to the common stockholders of Power. In other words when the bourne or goal of liquidation or dissolution of Power is reached, says the appellant, the preferred stockholders' rights will mature and they will become entitled to all the common stock of Railways. Second, the appellant asserts that the allotment to Power's common stockholders of an interest of 5.48% cannot be justified by Railways' earnings, or by those of the system, by the present value of Railways stock or in any other way. This last contention necessarily involves some discussion on our part of Power's earnings as well as those of the system.

The position of the Commission cannot be stated as briefly. It has found that "The assets of Power are * * * of insufficient value to satisfy the stated liquidation preference of the preferred stock in the amount of $100 per share for 600,000 shares, plus arrearages of $38,700,000, or a total of $98,700,000 as of December 31,

---

not a present value equal to that amount. If the contractual preferences are operative it is clear there will be nothing for the common shareholders."

[7] In Commonwealth & Southern Corp. v. Securities and Exchange Com'n, 134 F. 2d 747, 751, we pointed out the function of Section 11(e) in carrying out the scheme of the Act.

[8] The common stock of Railways, for reasons which need not be gone into in this opinion, is the only asset which Power will have available for distribution to its stockholders upon its dissolution. See note 5 supra.

[9] The standard "fair and equitable" set out in Section 11(e) is verbally the same as the standard applicable to plans of reorganization under the various provisions of the Bankruptcy Act. See Sec. 77, sub. e, 11 U.S.C.A. § 205, sub. e; former Sec. 77B, sub. f, 11 U.S.C.A. § 207, sub. f; Chapter X, Secs. 174 and 221(2), 11 U.

S.C.A. §§ 574 and 621(2); Chapter XI, Sec. 366, 11 U.S.C.A. § 766; Chapter XII, Sec. 472, 11 U.S.C.A. § 872.

[10] Mr. Justice Douglas in the cited case stated, inter alia, 308 U.S. at page 115, 60 'fair and equitable' as used in § 77B, sub. 'fair and equitable" as used in § 77B, sub. f, are words of art which prior to the advent of § 77B had acquired a fixed meaning through judicial interpretations in the field of equity receivership reorganizations. Hence, as in case of other terms or phrases used in that section, *Duparquet Houot & Moneuse Co. v. Evans*, 297 U.S. 216, 56 S. Ct. 412, 80 L.Ed. 591, we adhere to the familiar rule that where words are employed in an act which had at the time a well known meaning in the law, they are used in that sense unless the context requires the contrary. *Keck v. United States*, 172 U.S. 434, 446, 19 S.Ct. 254, 258, 43 L.Ed. 505."

1942." The Commission points out that Railways' balance sheets indicate a pro forma book value of $77,954,874 for Railways' common stock on a corporate basis and $81,554,330 on a pro forma consolidated basis and states categorically that the "present book values of assets pro forma are clearly insufficient to cover the liquidation preferences of Power's preferred stock. Similarly, on the basis of a capitalization of reasonably anticipated earnings of the enterprise we are unable to find an over-all value for the assets which approaches $98,700,000." The Commission finds that, "If the amount of the liquidation preference of the preferred stock ($100 per share plus accumulated dividends) is controlling, our inquiry must perforce be ended at this point in a decision that the preferred stock is entitled to all the assets of the corporation to the exclusion of the common."

How then can the Commission reach the conclusion, in view of the Los Angeles Lumber Co. case, that Power's common stockholders may receive an interest of 5.48%? This question may be answered as follows. The Commission asserts that while the type of liquidation contemplated in the case at bar is "involuntary" it is of a type that could not have been foreseen by the draftsman of Power's charter or by the investors in its stock. Next, it points out that in the Los Angeles Lumber Co. case and in Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, financial disaster had overtaken or threatened to overtake the corporate enterprises and that, therefore, reorganization securities had to be distributed among creditors and other claimants according to their contractual rights, determined as in liquidation; that in contrast Power is a company virtually without debt or financial embarrassments; that its existence is proscribed by the Public Utility Act of 1935, 15 U.S.C.A. § 79 et seq., and because of this fact Power's stockholders are prevented from maintaining their interests in a going concern; that for these reasons the "stockholders affected should be given participations according to their contractual or other rights determined as though in a continuing enterprise, and that the process of compliance with the statute should not be permitted to mature liquidation preferences * * * [and that] the measure of participation allowed should compensate for the substantive rights of security holders as they would exist apart from the reorganization * * *". The Commission states that in giving effect to the congressional mandate it should not allow the fact of liquidation "* * * to add value to one class of securities at the expense of another class." The Commission concludes that "Where simplification of a system is to be attained through elimination of an unnecessary corporate entity, it is our opinion that the 'fair and equitable' standard does not require us to consider liquidation rights as having matured, and as the sole measure of participation for the preferred stockholders; and it should be immaterial whether the simplification process takes the form of recapitalization, merger or distribution of the assets of a holding company in liquidation. In other words, the 'fair and equitable' standard requires the same recognition of substantive rights irrespective of the method employed in a particular case for obtaining the objectives of Section 11(b) (2)."

The Commission then asserts that "* * * if a class of preferred stock has a measurable interest in an enterprise absent the maturing of liquidation preferences and a proportionately greater interest upon the maturity thereof, it would not be fair or equitable under the statute to give recognition to the greater interest at the expense and to the detriment of the common stock. And conversely, if the common stock has a measurable interest apart from the maturing of liquidation preferences, we must not sanction the destruction of that interest through the operation of the statutory mandate." Referring specifically to the intent of Congress the Commission finds "* * * that the techniques employed under Section 11 should be those necessary to remove the holding-companies' concentration of economic power over operating utilities and * * * benefit investors generally by giving them more direct interests in the operating properties and earnings *to the extent that their holding-company securities represent any real equity therein.*" The Commission concludes, therefore, that it must judge "* * * the fairness of the plan according to legitimate investment values existing apart from the duty of liquidation imposed by the statute." and that the liquidation preference enters into the question of what is fair and equitable only as "* * * one of the bundle of rights belonging to the preferred stock and affecting its normal

416

value."; that preferences may not be permitted to operate so as to be conclusive in the division of assets between the preferred and common stocks to "accelerate the arrearages and translate them into matured claims at their full face amount, so as to entitle the preferred stock not only to all the assets but also in perpetuity to the entire earning power of those assets," a result which would enrich the preferred at the expense of the common. Fair and equitable compensation will be given to all of the claimants, asserts the Commission, "if their rights are measured not in terms of the situation created by the statute but rather in terms of the situation terminated by it—i.e., as though no liquidation were to take place."; that only in this way can each class of stock be accorded "* * * its proportionate share of the benefits to be gained from the elimination of a useless and expensive corporate entity and from the receipt of a security representing a more direct investment in the underlying assets and earnings of the system."

As to valuation the Commission states that "* * * it is unnecessary to arrive at any specific over-all value for the enterprise or for the preferred and common stocks of Power.", but that it is required "to examine into the respective existing interests of the preferred and common stockholders in the earnings of the enterprise."; that the valuation of the respective interests of preferred and common stockholders cannot be "an exact science" under the circumstances of the case at bar and that the best it can do is to determine "* * * what assumptions are necessary to arrive at the allocation, and ascertain whether such assumptions fall within the permissible limits of reasonableness."

The Commission then embarks upon a discussion of the corporate and consolidated net income per books applicable to the preferred and common stock of Power, the preferred dividend requirements and the balance of consolidated net income applicable to Power's common stock from the period from 1929 through 1942. A tabulation is attached to the Commission's opinion and we have reproduced this below.[11] The tabulation shows that Power's corporate income has not met the dividend

| 11 Years Ended December 31 | System Net Income Before Power's Preferred Dividend Requirements | | Power's Preferred Dividend Requirements | Consolidated Balance (Deficiency) Applicable to Common Stock of Power |
|---|---|---|---|---|
| | Corporate | Consolidated | | |
| 1929 | $ 2,663,602 | $ 9,971,641 | $ 2,469,505(a) | $ 7,502,136(b) |
| 1930 | 6,212,264 | 10,462,450 | 3,568,613(a) | 6,893,837(b) |
| 1931 | 6,956,991 | 7,819,382 | 3,600,000(a) | 4,219,382(b) |
| 1932 | 4,582,947 | 4,171,925 | 3,600,000(c) | 571,925 |
| 1933 | 1,233,591 | 1,510,925 | 3,600,000 | (2,089,075) |
| 1934 | 663,188 | 986,719 | 3,600,000 | (2,613,281) |
| 1935 | 311,268 | 2,411,652 | 3,600,000 | (1,188,348) |
| 1936 | 121,851 | 4,508,261 | 3,600,000 | 908,261 |
| 1937 | 402,139 | 5,182,602 | 3,600,000 | 1,582,602 |
| 1938 | 627,594 | 3,091,508 | 3,600,000 | ( 508,492) |
| 1939 | 2,342,432 | 4,598,654 | 3,600,000 | 998,654 |
| 1940 | 2,365,832 | 5,266,602 | 3,600,000 | 1,666,602 |
| 1941 | 930,813 | 4,134,544 | 3,600,000 | 534,544 |
| Total of 13 years | $29,414,512 | $64,116,865 | $45,638,118 | $18,478,747(e) |
| 1942 Estimated | 1,200,000 | 6,700,000(d) | 3,600,000 | 3,100,000 |
| | $30,614,512 | $70,816,865 | $49,238,118 | $21,578,747 |

a Preferred dividend paid during these years.
b During these years the following common stock dividends were paid:

1929 ............................ $1,841,937
1930 ............................ 3,441,262
1931 ............................ 3,469,597
None thereafter

c $900,000 or one-fourth of the annual requirements was paid in 1932.
d Before provision for $160,000 fixed charges on Power's debentures paid on May 1, 1942.
e In contrast, the consolidated surplus at December 31, 1941 was zero. The reduction has resulted from the provision for and the elimination of losses during past years.

requirements of the preferred stock since 1932 but that the consolidated (system) earnings for the same period produced a net balance applicable to the common stock. The Commission points out, however, that it has not been advisable in the past to pass up any substantial part of consolidated earnings to Railways or to Power and that these earnings have fluctuated widely over the fourteen-year period covered by the tabulation. But it is apparent none the less, that consolidated earnings during the ten years from 1932 through 1941 have come close to equalling the preferred dividend requirements. Also set out in the Commission's opinion is another table, reproduced in part in the footnote below.[12] This tabulation shows the comparative consolidated net income applicable to Railways common stock for the years 1937 through 1942. This includes a statement of earnings for 1942, based on nine months' actual operations and three months' estimated operations. The table shows that consolidated earnings applicable to the common stock of Railways, subject to certain adjustments which need not be set out here, averaged in excess of $6,000,000 for the five year period from 1937–41 inclusive and about $6,184,000 for the six year period from 1937–42.

Having before it the contents of these tables as well as evidence offered by one of Power's officers as to management's estimates of future earnings the Commission stated, "For the purpose of determining the existing rights of the preferred and common stocks in the enterprise, we have assumed earnings of $6,185,000, the average adjusted consolidated income applicable to Railways' common stock for the period 1937–42. However, it must be pointed out that in view of the actual earnings experience and the intangible factors discussed, this figure must be regarded as a very liberal assumption as to earning power." If the $6,185,000 annual consolidated earning figure be adopted, it will, as the Commission points out, require approximately fifteen years for the preferred dividend arrearages to be paid in full, even if all consolidated net earnings be applied to the payment of current and accumulated preferred dividends. In this connection the Commission stated, " * * * it is recognized that at best the interest of the common stock in earnings is remote. Particularly is this true since, as a practical matter, all consolidated earnings would not be available for disbursement to the preferred and common stockholders. The remoteness of the common stock's participation is also demonstrated by the fact that actual earnings have fluctuated substantially and have never in the past ten years exceeded the figure we are assuming except in 1942." The Commission then concluded, as we have stated, that it could not find that the proposal to allocate 8.8% of Railways stock to Power's common "falls within the permissible limits of reasonableness for a situation of this kind", but found upon consideration of all

The United Light and Railways Company
Comparative Consolidated Net Income Applicable to
Railways' Common Stock for the Years 1937 through 1942

| Period | Consolidated Net Income of Power Before Power's Preferred Dividend Requirements | Amount Applicable to Common Stock of Railways Adjusted for System as Constituted at April, 30,1942 | Adjustments for Non-recurring Expenditures Netted for Income Taxes | Adjusted Consolidated Balance Applicable to Common Stock of Railways |
|---|---|---|---|---|
| 1937 | $ 5,182,602 | $ 5,856,311 | $ 556,643 | $ 6,412,954 |
| 1938 | 3,091,508 | 3,962,314 | 749,095 | 4,711,409 |
| 1939 | 4,598,654 | 5,118,375 | 922,575 | 6,040,950 |
| 1940 | 5,266,602 | 5,772,567 | 1,091,483 | 6,864,050 |
| 1941 | 4,134,544 | 4,906,879 | 1,064,738 | 5,971,617 |
| Total of 5 years | $22,273,910 | $25,616,446 | $4,384,534 | $30,000,980 |
| 1942 (9 mos. actual; 3 mos. est.) | 6,874,277 | | 232,012 | 7,106,289 |
| Total of 6 years | $32,490,723 | | $4,616,546 | $37,107,269 |
| 5 year average (1937–1941 incl) | $ 5,123,289 | | $ 876,907 | $ 6,000,196 |
| 6 year average (1937–1942, incl) | 5,415,120 | | 769,425 | 6,184,545 |

the circumstances that the "* * * common stock is nevertheless entitled to some participation.", and that "* * * a participation for the common of approximately 5%, while representing the maximum, would not exceed the permissible limits of fairness, and to secure our approval the plan must be modified to reduce the common stockholders' participation accordingly."[13]

We have quoted at length from the findings and opinion of the Commission because the principles involved in the case at bar are of great public importance and it is necessary for the purposes of this opinion to show the basis of the Commission's decision. It will be observed that the theory of priorities first elucidated by the Commission in Community Power & Light Co.[14] and developed further in Federal Water Service Corp.[15] has been modified at least by inference by the Commission's decision in the case at bar.[16] There seems to be an unmistakable implication in Federal Water Service Corporation that contractual priorities of preferred stock, no matter how matured, when matured must be respected. This issue, however, was not squarely before the Commission in Federal Water Service Corporation since liquidation was not contemplated. It should be noted that the Commission in the instant case contends that it has in fact applied the "fair and equitable" standard prescribed by Section 11 (e) and has not deviated from the substance of the interpretation of that standard by the Supreme Court in the Los Angeles Lumber Co. case. In its order approving the plan as modified the Commission specifically found the plan and its proposed allocation to be "fair and equitable".

■ Is the Commission's determination correct? We are of the opinion that it is. We think that the essence of the Los Angeles Lumber Co. case is contained in the statement by Mr. Justice Douglas, 308 U.S. 106, 118, 60 S.Ct. 1, 84 L.Ed. 110, that the phrase "fair and equitable" has become "a term of art used to indicate that a plan of reorganization fulfilled the necessary standards of fairness." In Group of Investors v. Milwaukee R. Co., 318 U.S. 523, 565, 566, 63 S.Ct. 727, 749, 87 L.Ed. 959, Mr. Justice Douglas stated for the Supreme Court that "It is sufficient that each security holder in the order of his priority receives from that which is available for the satisfaction of his claim the equitable equivalent of the rights surrendered." In other words the rights of security holders are to be weighed as exactly as the circumstances permit. If it were possible therefore in the case at bar to arrive at the precise equivalents of the rights of the security holders by the employment of a mathematical formula, the answers given by the exercise of that formula would have to be fulfilled precisely as to each class of security holders in order that the plan of reorganization might achieve the standard "fair

---

[13] Upon modification as suggested, the Commission adjudged the plan to be "fair and equitable."

[14] 6 SEC 182.

[15] 8 SEC 893.

[16] See also Puget Sound Power & Light Co., SEC Holding Co. Release No. 4255 (April 28, 1943); Southern Colorado Power Co., SEC Holding Co. Release No. 4501 (August 24, 1943); and Virginia Public Service Co., SEC Holding Co. Release No. 4618 (October 16, 1943). It should be noted that the Commission's decision in Community Power & Light Co. followed the decision of the Supreme Court in the Los Angeles Lumber Co. case by twelve days but that that decision was not referred to in the Commission's decision in Community Power & Light Co. In Federal Water Service Corp. a majority of the Commission agreed with Commissioner Healy "that the absence of imminent liquidation cannot justify a plan as being fair and equitable * * * which destroys the contractual priorities of the preferred." The Commission went on to state, "The difference between our views and * * * [those of Commissioner Healy] is that we consider that the contractual rights of the preferred are substantially different where liquidation is not in the atmosphere. We hold that, in such instances, the preferred is being deprived of nothing to which it is entitled. Where liquidation has not been proposed and need not be compelled, a liquidation right is merely one of the bundle of rights which imparts value to a security. Absent liquidation, the liquidation preference of a senior class of stock is only an inchoate right to a future payment, which has no definite maturity date, and which will not mature into a present claim despite failure to pay dividends. In addition to this inchoate right to a liquidation preference, the senior stock has present rights to current and accumulated dividends. This right, however, is not absolute, as is a creditor's right to interest; it is only a relative right *vis a vis* junior classes of stock. These junior classes, conversely, have rights *vis a vis* the preferred stock."

and equitable". Each security holder must be compensated as exactly as he can be for that which he is giving up. But though his cup must be filled level to the brim, it must not run over. This much is plain.

■ There is a vital difference, however, between a 77B or a Chapter X reorganization and that proposed in the case at bar. That difference lies in the fact that the obligation to pay to the preferred stockholder $100 and accrued dividends on each share of his stock has not matured. It has not matured because the condition of liquidation prescribed by the charter of Power has not occurred. But that condition, says the appellant, will occur, and therefore the rights which accrue to the preferred stockholders on liquidation must be treated by the Commission and by the courts as having accrued already. Herein we think lies the fallacy of the appellant's argument. Though the preferred stockholders of Power have contract rights which entitle them to the payment of $100 a share and accumulated dividends on liquidation or dissolution of Power, those rights, at least in the absence of insolvency, have not matured and cannot mature for the reason that the congressional mandate contained in the Act strikes across contract rights and the maturities embraced by them, severing them. Though severed, they are not lost for, as we have seen, they must be transmuted as nearly as can be into their equitable equivalents.[17]

■ As was pointed out by the Circuit Court of Appeals for the Second Circuit in New York Trust Co. v. Securities and Exchange Com., 131 F.2d 274, 276,[18] "Where, through no fault of either party, something necessary for the continued performance of a contract goes out of existence because of some unforeseen circumstance and none of the parties have assumed that risk the contract is regarded as charged with the implied condition that if what is necessary to performance becomes unavailable the contract is no longer binding and further performance is excused." The fundamental doctrine cited is applicable in the instant case. The contracts between Power and its stockholders and the contracts between the stockholders inter sese have come to an end because Congress has decreed it. The corporation no longer possesses the power to perform its contract with its preferred stockholders. The corporation therefore is no longer bound to the performance of that contract and the preferred stockholders are no longer entitled to its performance. This does not mean, however, that the value of the preferred stockholders' rights must not be transmuted into their equitable equivalents. But if that is done, the plan of reorganization must be deemed to be fair and equitable within the ruling of the Los Angeles Lumber Co. case.

■ Since the fundamental standard prescribed is that of fairness, the Commission correctly has treated the acceleration right of the preferred stockholders as one to be weighed with all other rights in arriving at the determination of what is fair for the preferred and common stockholders of Power. To permit the preferred stockholders of Power to take all of the common stock of Railways because as an incident in the plan for the simplification of the holding-company system their preferences are to be deemed to be matured would be to bestow a windfall on the preferred stockholders. The fact that the dissolution and liquidation of Power is to be effected under the congressional mandate imposed by Section 11(b) (2) of the Public Utility Act of 1935 instead of those imposed by Section 77B or Chapter X of the Bankruptcy Act is of particular significance for the reason stated and because of other considerations as well. First, it was the intention of Congress in enacting the Public Utility Act of 1935 to preserve the values of securities and not to destroy or diminish their values.

---

[17] Such a situation arising under the Public Utility Act of 1935 is analogous to those which have frequently arisen under the Anti-Trust Acts where contract rights must be set aside in order to effectuate the judgment of the contract and to avoid the continuation of the prohibited monopoly. See such cases as Ethyl Gasolene Corp. v. United States, 309 U.S. 436, 455, 456, 60 S.Ct. 618, 84 L.Ed. 852; United States v. International Harvester Co., 274 U.S. 693, 704, 705, 47 S.Ct. 748, 71 L.Ed. 1302.

Cf. United States v. Reading Co., 226 U.S. 324, 357, 358, 33 S.Ct. 90, 57 L.Ed. 243, and Eastern States Lumber Ass'n v. United States, 234 U.S. 600, 606, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788.

[18] The Court affirmed the Commission's ruling that Power should not be compelled to pay off the holders of its debentures at a premium because they had been called prior to maturity despite a contract provision to that effect.

The legislative history of the Act makes this clear.[19] Congress did not intend that maturities of securities should be accelerated to give any creditor or stockholder a special position to the detriment of any other party in interest in the corporate enterprise. We come therefore to the legal question[20] whether the plan here in issue is "fair and equitable" within the meaning of that phrase as used in Section 11(e).

We think that it is. In making this statement we do not arrogate to ourselves the functions of the Commission or of the District Court. Our jurisdiction is prescribed by Section 25 of the Act, 15 U.S.C.A. § 79y, as was that of the District Court. The learned District Judge specifically approved the plan as "fair and equitable".[21] Section 24(a), 15 U.S.C.A. § 79 x(a), provides that "The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." This court cannot make findings and review the evidence as if de novo. But, if we were entitled to do so, we would find that the plan was "fair and equitable" for reasons closely akin to those given by the Commission and by the District Court.[22] Those reasons are set out in the following paragraphs.

What the Commission has done is to capitalize the chances of the common stockholders of Power to receive some value for their present interest in a going utility system. As is pointed out in the Commission's brief, absent reorganization, the preferred stockholders of Power are entitled to receive an annual dividend of $3,600,000 and they are entitled to receive all earnings in excess of that amount until the accrued dividends amounting to $38,700,000 were paid off. The Commission has estimated that a fifteen year period will be required at best to reduce the arrearages of dividends to zero. After the payment of arrearages the preferred stock would receive only $3,600,000 a year and the net annual earnings would be available for the common stock. The Commission arrived at the figure of $6,185,000 per year as its estimate of annual average earning power on a consolidated basis, but stated that this was "a very liberal assumption". It must be discounted accordingly. If the plan be carried out the preferred stockholders will give up about 5% of their exclusive claim to all of the income for a fifteen year period and 5% of their exclusive right to the first $3,600,000 of income earned thereafter. In exchange they receive a new right to 95% of the annual earnings in excess of $3,600,-000, which the Commission has estimated at $2,585,000, to begin after the fifteen year

[19] Reference was made to the techniques developed by the courts in applying the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1-7, 15 note, and the Commodity Clause of the Hepburn Act, 49 U.S.C.A. § 1(8). These were referred to as permitting " * * * readjustments and reorganizations, without the acceleration of indebtedness or the maturing of rights upon liquidation, to enable corporations to rearrange their corporate structures and divest themselves of properties to the extent required to comply with Government policy." See H.R. Rept. 1318, 74th Cong., 1st Sess., at pp. 49-50, and the "Additional views" of Congressman Eicher, appended to the House Report to accompany S. 2796. Congressman Eicher cited the case of Continental Insurance Company v. United States, 259 U.S. 156, 171, 42 S.Ct. 540, 545, 66 L.Ed. 871, in which the Supreme Court stated, "The power of the court under the Sherman Anti-Trust Law to disregard the letter and legal effect of the bonds and general mortgage under the circumstances of this case, in order to achieve the purpose of the law, we cannot question."

The President of the United States in his message to Congress of March 12, 1935 stated that the measure " * * * will not destroy a penny of actual value of those operating properties which holding companies now control and which holding company securities represent insofar as they have any value." See S. Rept. 621, p. 2, 74th Cong., 1st Sess.

[20] See Case v. Los Angeles Lumber Co., 308 U.S. at page 119, 60 S.Ct. 1, 84 L.Ed. 110.

[21] The court, as did the Commission, also found the plan appropriate to effectuate the provisions of Section 11. No one doubts that appropriateness.

[22] We conclude that the decision of the Supreme Court in Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626, is not precisely apposite. See Judge Leahy's opinion, 51 F.Supp. at page 225. In the Chenery case the Commission was dealing with the standard "fair and equitable" as applicable to trading by the management in the course of the reorganization. The language of Mr. Justice Frankfurter, however, shows the general approach of the Supreme Court to the problems presented by the Act.

period and to run as long as the system shall endure.

The Commission in its brief expresses this exchange of rights in other terms as follows. The common stockholders are giving up 100% interest in an estimated $2,585,000 annually which will begin in about fifteen years. In exchange for that right they will acquire a present 5% interest in annual earnings of $6,185,000 a year. This amounts to $309,250. The difference between $2,585,000 and $309,250, which is a ratio of about 8.4 to 1, demonstrates the extent to which the Commission weighted Power's common stockholders' allocation of the common stock of Railways in order to recognize the elimination of the fifteen year delay as well as the $3,600,000 annual preference of the preferred stockholders. The Commission clearly recognized the risk that earnings available for distribution might be less than $6,185,000 a year. But for the element of risk the relationship between the future interests surrendered and the present interests to be received under the plan may be compared to the difference between an annuity of $8.40 beginning fifteen years hence and an annuity of $1 a year beginning immediately. To make these annuities mathematically equivalent, the annuity of $8.40 a year would be subjected to discount to present value at the rate of 15.2% a year.

Thus, as the Commission points out, 15.2% measures the risk factor upon which the Commission based the assumption that the common stock might receive an estimated $2,585,000 a year beginning fifteen years in the future. This is a very high discount rate and expresses adequately the risk inherent in the expectation that the Commission's earnings estimate will be realized. In employing this high measure of risk factor the Commission offsets its very liberal estimate of $6,185,000 of consolidated earnings.

We think that it is apparent that the consolidated earnings of the system, absent or with reorganization, will run far in excess of the annual dividend requirements of the preferred stock of $3,600,000 a year. While the amount of accrued dividends is substantial and may not be liquidated within the fifteen year period estimated by the Commission, it is none the less apparent that the accumulated dividends will be liquidated at some future time if the system remains in business as a going concern.

We cannot say that the liberal estimate of system earnings arrived at by the Commission is too liberal. That question is and must be one which remains within the expert administrative judgment of the Commission. We can and do say that in our opinion the common stockholders of Power cannot be cut out of participation in the system earnings and the plan be deemed to be fair and equitable.

But, the appellant will assert in answer that the preferred stockholders of Power are entitled to all of the earnings of Power and vice Power to all of the earnings of Railways until they have received their arrearages of dividends. It is true that the common stockholders of Power might be given some form of participation which would entitle them in the future to all of the earnings above the preferred stockholders' dividend requirements when the arrearage of preferred dividends had been paid in full. The rights of the preferred stockholders could be limited accordingly. This, however, would introduce into a public utility holding company financing a kind of "security" of no present value marketwise and of a type which experience has proven to be undesirable. The final answer is that the Commission did not see fit to adopt such a plan and no one has suggested it. Under the plan the preferred stockholders of Power acquire immediate control of the holding company system, a 95% interest therein, and an immediate right to the payment of dividends. This seems to us to be the equitable equivalent of the rights which they are giving up. That most of them think so is evident from the fact that with the exception of the appellant, which holds ten shares of the preferred stock, none has seen fit to appear in the District Court in objection to the plan. As the Commission has found, the allowance of about 5% of the common stock of Railways to the common stockholders of Power does "not exceed the permissible limits of fairness * * *". In the absence of an exact measuring stick or a mathematical formula, neither of which are available, it is our opinion that the Commission is entitled to apply the tests which it has applied and the result which it has reached is sanctioned by the law.

One further point remains to be disposed of. The appellee, Power, insists that the appellant was not a party to the proceeding in the District Court having a

right to appeal from that court's judgment. This is based upon the theory that because Otis & Co. did not appear in the proceedings before the Commission and raised no objection to the plan it had no right to be heard in the District Court. The appellee cites the provisions of Section 24(a) of the Act, 15 U.S.C.A. § 79x(a), which provides for an appeal to this court by any person aggrieved by an order of the Commission "within sixty days after the entry of such order." Section 11(e) as we have seen provides for a hearing before the District Court after notice and opportunity for hearing. Briefly, the appellee takes the position that it was the intention of Congress to provide for judicial proceedings under Section 11(e) only in aid of the enforcement of the Commission's order which should be subject to judicial review by the Court of Appeals and that the issues before the District Court should have been so limited. Power asserts that it was not the intention of Congress to provide for a full judicial review as the validity of an order in a proceeding before the District Court. Such in the view of the appellee, is a "summary proceeding".

We cannot agree with this interpretation of the statute. While it is clear that Section 24(a) gives the Circuit Courts of Appeals jurisdiction to review any order issued by the Commission upon the application of a party aggrieved thereby, it is equally clear that Section 11(e) contemplates that any person affected by the plan shall have the right to be heard as to whether or not the plan is fair and equitable and appropriate to effectuate the provisions of Section 11. In Commonwealth & Southern Corp. v. Securities and Exch. Com'n, 134 F.2d 747, 753, we indicated that stockholders whose rights were affected by an order of the Commission directing a public utility holding company to change its corporate structure had a right to be heard in that District Court of the United States in which the Commission was seeking to effect its order; that otherwise those stockholders would be deprived of property without due process of law. It follows that the proceeding before the District Court cannot be deemed to be a summary one. Moreover, the fact that notice is to be given to the persons affected by the plan shows that the theory of submission to the District Court is substantially similar to that required in respect to a plan made pursuant to the provisions of Section 77B

or Chapter X of the Bankruptcy Act. True, the issues presented to the District Court are limited to the matters prescribed by the statute but this is the extent of the limitation. Since Otis & Co. was a stockholder it was entitled to be heard. The court below treated Otis & Co. as an intervener, but even if it had not Otis & Co.'s right to appeal in the case at bar would be plain. See the provisions of Section 25 of the Act.

The judgment of the court below is affirmed.