**In re ENGINEERS PUBLIC SERVICE CO.**
Nos. 9428, 9435, 9440.

Circuit Court of Appeals, Third Circuit.
Argued Oct. 10, 1947.

Decided March 19, 1948.

On Petitions for Rehearing June 11, 1948.

8 2 Cir., 170 F. 48.

Francis H. Scheetz, of Philadelphia, Pa. (Evans, Bayard & Frick, of Philadelphia, Pa., on the brief), for Home Ins. Co., and others, preferred stockholders.

Roger S. Foster, of Washington, D. C. (Sidney H. Willner, Associate Solicitor, Harry G. Slater, Chief Counsel, Public Utilities Division, Securities and Exchange Commission, Bernard S. Kanton, Jerome S. Katzin, and Myer Feldman, all of Philadelphia, Pa., on the brief), for Securities and Exchange Commission.

Frederick Zazove, of New York City (Lawrence R. Condon and Milton Maurer, both of New York City, on the brief), for Streeter and others, preferred stockholders.

Louis Boehm, of New York City (Raymond L. Wise and William Esbitt, both of New York City, on the brief), for Lucille White and others, common stockholders.

Alfred Berman, of New York City (Herbert L. Cobin, of Wilmington, Del., Philip W. Amram, of Washington, D. C., J. Howard Rossbach, Abraham Shamos, and Guggenheimer & Untermyer, all of New York City, on the brief), for Central Illinois Securities and Christian Johnson.

Before BIGGS, ALBERT LEE STEPHENS and MARIS, Circuit Judges.

BIGGS, Circuit Judge.

The pertinent facts relating to these three appeals are clearly and succinctly set out in the opinion and findings of fact of the court below. See 71 F.Supp. 797. In addition thereto more complete descriptions of Engineers Public Service Company and its holding company system will be found in In the Matter of Engineers Public Service Co., 9 S.E.C. 764, 10 S.E.C. 904, and 12 S.E.C. 41 and 268. In view of these reports, no extended recapitulation of facts will be necessary.

The questions presented may be put as follows: (a) Did the Commission properly approve as "fair and equitable" within the meaning of Section 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(e), cash payments in certain amounts to be made to the preferred stockholders of Engineers Public Service Company; and (b) did the court below err in refusing to approve the plan proposed by the Commission as "fair and equitable",

deciding that the cash payments should be in lesser amounts than those set up by the Commission? These questions, albeit put as two, are in fact one and one answer will suffice for both.

Preliminarily it may be stated that after extended hearings the Commission issued a series of orders designed to effect the integration of the Engineers system pursuant to Section 11(b) (1) of the Act. It is unnecessary to deal with these orders and with their disposition in detail.[1] It is enough to state here that Engineers has no funded debt; that its capital structure consists of preferred and common stock. The preferred stock is divided into three series. There are presently outstanding 143,951 shares of $5 cumulative dividend convertible preferred stock; 183,406 shares of $5.50 cumulative dividend preferred stock, and 65,098 shares of $6 cumulative dividend preferred stock. Each share of the three series has a stated value of $100 and under the applicable charter provisions each share is entitled to receive $100 plus accrued dividends in the event of involuntary liquidation; but on redemption or voluntary liquidation each share of the $5 series is entitled to receive $105 and each share of the $5.50 and each share of the $6 stock is entitled to receive $110 per share, plus accrued dividends.[2] The $5 series was sold with a convertible feature which need not be described here since it expired some time ago. The $5.50 series was sold with warrants, presently inoperative, entitling the holder thereof to purchase common stock. Engineers was given the right, to be exercised at its option, to redeem or call the whole or any part of the preferred stock at $100 per share, plus the fixed redemption premium therefor, together with the amount of any dividends accrued, or to repurchase its preferred stock from time to time at a price not exceeding that at which the stock might be redeemed.[3]

Reduced to its simplest terms the plan approved by the Commission provides that Engineers shall dissolve [4] and that its preferred stockholders shall receive for each

---

[1] Engineers filed a petition for review of certain of the orders of divestiture and integration in the United States Court of Appeals for the District of Columbia which reversed the Commission's orders in part. See Engineers Public S. Co. v. Securities and Exchange Com'n, 78 U.S.App.D.C. 199, 138 F.2d 936. Both Engineers and the Commission filed petitions for writs of certiorari to the Supreme Court. Writs were granted. See Engineers Public Service Co. v. S.E.C., 322 U.S. 723, 64 S.Ct. 1273, 88 L.Ed. 1561. Disposition was not had because of the lack of a quorum. In the meantime Engineers disposed of the properties which were the subject of the Commission's orders. On October 20, 1947, the Supreme Court dismissed the appeals as moot. See 332 U.S. 788, 68 S.Ct. 96.

[2] As follows:

"III. Preference on Liquidation, etc. In the event of liquidation, dissolution or winding up of this Corporation or any reduction of its capital stock, resulting in any distribution of its assets to its stockholders, the holders of the preferred stock of each series shall be entitled to receive, for each share thereof, an amount equal to $100, together with all dividends acrued or in arrears thereon, plus, in case such liquidation, dissolution or winding up or reduction shall have been voluntary, the fixed redemption premiums for such series, if any, before any distribution of its assets shall be made to the holders of the common stock; but the holders of the preferred stock shall be entitled to no further participation in such distribution. * * * A consolidation or merger of this Corporation with any other corporation or corporations shall not be regarded as a liquidation, dissolution or winding up of this Corporation within the meaning of this Paragraph III, provided such consolidation or merger does not substantially impair the rights and the preferences of the preferred stock. * * * *"

[3] The applicable charter provisions are as follows:

"IV. Redemption and Repurchase. The Corporation may, at its option, at any time or from time to time, redeem the whole or any part of the preferred stock or of any series thereof, at a price for each share thereof equal to $100, plus the fixed redemption premium therefor, if any, together with the amount of any dividends accrued or in arrears thereon. * * * This Corporation may also from time to time repurchase shares of its preferred stock at not exceeding the price or prices at which the same may be redeemed. * * * *"

[4] The dissolution has in fact taken place and the directors are constituted trustees pursuant to the provisions of Section 43 of the Delaware Corporation Law. Rev. Code of Delaware, 1935, Section 2075.

share of preferred stock an amount equivalent to its stated value, plus the redemption premium as if on *voluntary* liquidation, with accrued dividends to the date of the deposit of each share with a designated depository.[5] In other words, the three series of preferreds would be paid off at $105, $110 and $110 a share plus dividends. The court below took a different view, concluding that the plan approved by the Commission was not fair and equitable to the common stockholders of Engineers. Exercising its independent judgment it held that the plan would be fair and equitable if each share of preferred stock of Engineers received as payment only its stated value; viz. $100, plus an amount equal to the accrued dividends to the date of deposit. These payments would be the equivalents of those received by the preferred stockholders if Engineers had been subjected to *involuntary* liquidation, the common stockholders profiting, of course, to the extent of the difference. The common stockholders also give up their stock in Engineers and receive in lieu thereof stocks of subsidiary operating companies and other considerations. What has been stated represents the difference *in money* between the views of the Commission and that of the District Court, but the methods whereby the respective monetary results of the Commission and the court were arrived at represent the substantial question in the appeal at bar.

The Commission asserts that it arrived at the amount to be paid in cash for the preferred stocks by the application of the doctrine of equitable equivalents as enunciated by the Supreme Court in Otis & Co. v. Securities and Exchange Commission (The United Light and Power Co.), 323 U.S. 624, 65 S.Ct. 483, 89 L.Ed. 511. It takes the position that it has obeyed the clear mandate of the Act in that it has measured the rights to be surrendered by the preferred stockholders in terms of investment value; that is to say *ex* the Act which itself necessitated the dissolution of Engineers. Relying on its interpretation of the Otis & Co. case the Commission has disregarded the liquidation provisions of the charter. The Commission in arriving

at a value for the preferred stocks relied in large part on the testimony of two experts, Dr. R. A. Badger and Mr. D. C. Barnes, president of Engineers. Dr. Badger prepared a report in which he analyzed the value of the three series of preferred stock comparing them as to fair investment, going concern and intrinsic value with stock of five other public utility holding companies like Engineers. He testified that he made his studies without regard to the plan of divestiture of Engineers required by Section 11 of the Public Utility Holding Company Act. He concluded that the three series of preferreds were worth respectively $107.49, $118.31 and $129.07 per share. He also compared the preferred stocks of Engineers with those of ten operating and holding companies selected on the basis of similarity of earnings' history with Engineers and found that these stocks had sold during the period examined at an average yield of 4.5%. Applying this yield to the three Engineers' preferreds he arrived at values for the three series of $111.11, $122.22 and $133.33. He reached the conclusion nonetheless that the "investment characteristics of the Company" and the conditions of the money market placed a proper yield for the three series of Engineers preferreds, absent a call price, of 4.6%. In view of the foregoing he expressed the opinion that the investment values of the three series were respectively $108.70, $119.57 and $130.33. Dr. Badger's evidence as to values also included a number of other elements, the principal items of which are referred to in the opinion of the court below. See 71 F.Supp. at pages 801, 802. These included the charges and preferred dividends earned, the proportion of obligations to total capitalization, the book value of equity per share of preferred, the percent of quick net assets to prior obligations and the times the parent company dividends were earned. Dr. Badger also commented on the "possible permanency of the [general] interest rate" and based his opinion, to a considerable extent, on this factor. These estimates of value were based as will have been observed on the continued existence of Engineers as a "going concern". Dr. Badger really was testifying as we

---

[5] See "The Plan", Exhibit C attached to the application of the Commission.

have indicated as to the *investment values* of the preferreds; in short what they were worth to the present stockholders without the impact of the Act. Next, employing the call or voluntary redemption prices of the preferred as "stoppers", he cut the values down to the respective amounts, as we have stated, of $105, $110 and $110 a share. Mr. Barnes testified that the United States was in a "boom period". While conceding that the investment value of the preferreds might be as high as indicated by Dr. Badger his attitude was a more cautious one. We think that it is apparent on a careful examination of the testimony of the two men that each was testifying to values as of May, 1946, *ex* the Act.

The District Court expressly stated that it accepted Dr. Badger's values and that in the absence of a showing of changed circumstances it would deem them to be applicable at the time of the hearing. The District Judge went on to say, however, that "It must be conceded * * * that these values are not controlling because the plan itself does not propose to give these amounts to the preferreds." The court considered a number of other elements which it designated as "colloquial" equities. It pointed out that "A significant reason why the present preferreds are able to be evaluated at more than their redemption prices is because of retained earnings over a period of years not paid as dividends to the common stockholders.", and that "The past sacrifices and contributions of the common contributed significantly to the present value of the preferreds. * * *" The court also concluded that the issuing prices and market histories of the preferreds looked toward non-payment of any premium, that none of the series of preferreds was initially sold to the public at prices in excess of $100 per share and that in order to sell the preferreds even at these prices it was deemed necessary to attach

a convertible feature to the $5 series and warrants to the $5.50 series; that there was "no showing" that Engineers in fact received the amounts which the public paid for the various issues; that underwriting fees and "underwriting spreads in vogue at the time" were large. "The important consideration", said the court, "is not what the preferred security holders paid, but how much the company received for their stock." The court concluded that Engineers did not receive as much as $98 a share and states that as a matter of "colloquial equity" the preferred stocks should not be paid a premium. The trial court stated that market history *ex* the conversion and warrant privileges showed an average price "much below $100 per share" and that the importance of the conversion and warrant features is demonstrated by the lower average price of the $6 preferred in comparison with the other two series. The District Judge laid emphasis on the fact that dividends were not paid on the preferreds from July 1, 1933, to July 31, 1936, the accumulated arrearages being paid off in 1936 and 1937. He said: "The market history accordingly not only fails to support the preferred's claim to a premium, but affords affirmative support to the non-payment of the premium." The court pointed also to the charter provisions of Engineers, concluding that the liquidation of the company was an involuntary liquidation brought about by the operation of the Holding Company Act, and, while not holding this fact to be determinative in respect to values, nonetheless referred to decisions where, the provisions of the Act having worked a dissolution, courts had treated the charter provisions of the holding companies involved as dispositive of the issue of whether premiums should be paid.[6,7] In this finding of fact the court below laid particular emphasis on the losses sustained by Engineers in making

[6] The court cited: In re Consolidated Electric & Gas Co., D.C.Del., 55 F.Supp. 211; In re North Continent Utilities Corp., D.C.Del., 54 F.Supp. 527; City National Bank & Trust Co. of Chicago v. S.E.C. and North American Light & Power Co., 7 Cir., 134 F.2d 65; New York Trust Co. et al. v. S.E.C., 2 Cir., 131 F.2d 274 and In re Standard Gas & Electric Co., D.C.Del., 59 F.Supp. 274.

[7] For references contained in this paragraph, see 71 F.Supp. pp. 801, 802.

the divestitures required by the Commission.[8] The trial judge also made a cogent finding respecting Dr. Badger's use of interest rates as an aid in fixing values for the preferreds deeming the interest rate used by the latter to be too low. This finding also is set out in the margin.[9] The court below, as has been said, reached the conclusion that the amounts which should be paid to the preferreds should not exceed the cash payments which would have been received by them under a strict construction of Engineers' charter in an involuntary liquidation.

The court also said, and this represents the greatest difference between the respective approaches of court and Commission to the problem of valuation [71 F.Supp. 802], "I do not consider the argument advanced [by the Commission] as to what these series of preferreds would be worth if there were no Public Utility Holding Company Act. I do not think it profitable to consider an argument based on unreality *for there is a Public Utility Holding Company Act.* Unless one subscribes completely to the doctrine of foreordination, things might always be different from what they are." While recognizing that there might be more than one road to a fair and equitable plan of reorganization under the Act the court concluded that because the Commission had failed to weigh the factors of divestiture and dissolution as well as the other elements referred to in the court's opinion the plan did not meet the test of the Act since it was not fair and equitable.

---

[8] As follows:

"37. Engineers sustained substantial losses on many of the properties sold by it in compliance with the requirements of Section 11(b) (1) of the Act and the Commission's divestment Orders thereunder. The largest of such losses was with respect to its investment in Puget Sound Power & Light Company which, after being drastically reduced in a Section 11(e) reorganization under the Holding Company Act, was disposed of in compliance with the Commission's divestment Orders, for a total consideration of $774,475, as compared with a cost to Engineers of $34,000,000. The book loss on this investment was thus more than $33,000,000. A formal offer of proof was made during the proceedings before the Court to establish that the equity owned by Engineers in Puget Sound prior to the recapitalization would presently have a cash value of $10,000,000. It is not necessary for present purposes to determine this amount with exactitude. The subsequent increases in the earnings of Puget Sound, concerning which the Court takes judicial notice (Moody's Public Utility Manual [1946] p. 1081), over the amount estimated by the Commission for reorganization purposes (13 S.E.C. 226, 243), and the increase in market prices for utility common stocks which occurred subsequent to 1944 (to which the Securities and Exchange Commission makes reference in its Twelfth Annual Report to Congress, at p. 46) make plain that Engineers' investment in Puget Sound came to have a realizable cash value substantially higher than the amount realized by Engineers under the circumstances referred to above. Substantial book losses were also sustained by Engineers on the sale of its investments in Western Public Service Company of Maryland, of Missouri Service Company and Northern Kansas Power Company, of Savannah Electric & Power Company, and of others.

"In the case of El Paso Natural Gas. Company, with which Engineers also was ordered by the Commission to sever its. relationship, Engineers held a valuable option on which it managed to realize a book profit; but subsequent to compliance with the Commission's divestment Order the market price of the El Paso Natural Gas Stock divested by Engineers, rose by more than $4,000,000."

[9] As follows:

"51. The record establishes that the values attributed by Badger to the Engineers preferred stocks, largely depend not only on market and economic conditions, but also on continuance of current money rates which were at the time of Badger's study concededly the lowest in the country's history; that such money rates in turn largely depend on continuance of governmental financial policies including 'pegging' of the market on government securities; and that there is and can be no assurance that such policies will not be modified; nor can it be foretold how soon such modifications may take place. The extremely low money rates which resulted in Badger's finding that the preferred stocks of Engineers have an 'investment value' greater than $100 per share, largely reflect artificial factors which are clearly subject to changes at any time and may well be of purely transitory character."

At this point arises a question of law which, we think, goes to the heart of the instant controversy. What is the power conferred on the district courts of the United States by the Act? Section 11(e) provides that if the Commission finds a pro plan of divestiture and integra-essary to effectuate the provisions ion 11(b) and to be fair and equita-the persons affected by it, the Com-██on shall make an order approving the ██ and may then apply to a district court ██he United States to carry out its terms. ██bsection (e) states also that, "If, upon ██ny such application, the court, after notice ██nd opportunity for hearing, shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of section 11, the court as a court of equity may, to such extent as it deems necessary for the purpose of carrying out the terms and provisions of such plan, take exclusive jurisdiction and possession of the company or companies and the assets thereof, wherever located. * * *"

The Commission takes the position before us that "Unless the conclusions of the Commission lack 'any rational and statutory foundation' they should not have been disturbed by the court below for the " 'fair and equitable' " rule of Section 11(e) * * * [was] inserted by the framers of the act in order to protect the various interests at stake. * * * The very breadth of the statutory language precludes a reversal of the Commission's judgment save where it has plainly abused its discretion in these matters.",[10] citing, among other authorities, Securities Comm'n v. Chenery Corp. (the second Chenery case), 332 U. S. 194, 195, at pages 207, 208, 67 S.Ct. 1575, at pages 1582, 1583. The court below takes a very different view, asserting that a "§ 11(e) court has the affirmative and independent duty to consider and find whether a proposed plan, which has been approved by the Securities and Exchange Commission, is fair and equitable.", citing

its decision In the Matter of Interstate Power Co., D.C.Del., 71 F.Supp. 164.

The legislative history of the Public Utility Holding Company Act of 1935 throws some light on this vital question. The report of the Senate Committee which reported out the original bill states, "Section 11 provides that plans for the voluntary readjustment of the affairs of holding companies to conform with the section may be presented to the federal courts at any time and that in such cases those courts may exercise in the furtherance of such voluntary plans *all the extraordinary powers such courts have been accustomed to exercise when called upon under the Sherman and Hepburn Act[s]* [15 U.S. C.A. §§ 1-7, 15 note, 49 U.S.C.A. § 1 et seq.] *to effect compulsory corporate readjustments required by the public policy expressed in those acts.* * * *. The title provides that *during all court processes the SEC will act as the impartial expert economic adviser and administrative assistant to the courts.*[11] That expert assistance will enable the courts to save time and expense in the solution of essentially economic and administrative problems for which in the Sherman Act cases it had no assistance except that of opposing counsel." See Senate Report No. 621, accompanying S. 2796, 74th Cong. 1st Sess.[12] We think that it will not be contended that a district court of the United States adjudging a controversy arising under the Sherman Act would function other than as in an original equity proceeding, exercising all the powers and duties inherent in a court of equity under such circumstances.

The Congressional debates which attended the passage of the Act disclose that again and again members of Congress demanded and received assurances that the plenary jurisdiction and powers of the district courts of the United States would not be diminished or encroached upon by the functions allotted to the Commission under the law. S. 2796 as originally cast

---

[10] Brief for the Securities and Exchange Commission, p. 17.

[11] Emphasis has been added at this and all later points of the opinion.

[12] The original bill suffered many changes and vicissitudes during its course

through Congress but it should be noted that the provisions of Section 11(e) remained substantially unchanged. See S. 2796, 74th Cong., 1st Sess. introduced by Senator Wheeler on May 7 (Calendar day May 9), 1935.

provided in regard to reorganizations under Section 11(d), (e) or (f), that if a trustee was to be appointed the court should appoint the Commission. The bill provided originally that "it shall be the duty of the court, to constitute and appoint the Commission as sole trustee." The Senate insisted, however, that the language should be changed so that the duty of the court to appoint the Commission as trustee was clearly permissive and not mandatory. This change was effected to the end that the powers of district courts of the United States would not be curtailed. Senator Wheeler stated that the jurisdiction of the courts would not be ousted "because the court has to approve the plan even though the Commission approves it." He went on to say: "In other words, there is really a *double-check* upon the plan, and final determination rests *as in the past* in the courts." See 79 Cong.Rec. 8845, 74th Cong., 1st Sess. We think that by the words quoted Senator Wheeler conveyed the thought that the "check" to be made on a plan by the court was to be as full and complete as the "check" made by the Commission on the plan. We conclude also that by using the phrase "*as in the past*" the Senator made clear the concept that the court should fulfill the traditional function of a court of equity. See also the remarks of Senator Clark and Senator McKellar during the course of the debate. Senator Barkley also spoke to this point. Replying to a statement by Senator McKellar that the latter preferred to put the function of decision in respect to the appointment of receivers in the courts rather than in the Commission, Senator Barkley said that it was not the intent of the Act to tell " * * * the court how to decide the law, or as to equities among investors or *how a reorganization shall be brought about*. The appointment of receivers is an administrative matter which is to be performed by the court." While the Senate in the specific instances referred to was debating the function of appointing receivers, the intent of the debating Senators in respect to the power and duty of the district courts in regard to the approval or disapproval of plans of reorganization certainly was made manifest. For the debate see Cong.Rec. supra pp. 8937-9.

The interpretation of the Act by the Commission seems also to bear out the ruling of the court below that the district court's function in respect to the approval or disapproval of plans of reorganization is full, plenary and independent. A chairman of the SEC, Mr. Ganson Purcell, testifying before the Securities committee of the Committee on Interstate and Foreign Commerce, House of Representatives, on "Study of Operations Pursuant to the Public Utility Holding Company Act of 1935", p. 873, Part 3, 79th Cong., 2d Sess., 1946, said that the stockholder's " * * * new interest [in reorganization] is gaged by his claim under the old security and his treatment must be found by the courts and the Commission to be fair and equitable." Mr. Purcell also stated in respect to the enforcement of a plan in a district court of the United States that "That district court is * * * required to find under section 11(e) that the plan is fair and equitable, and proper to carry out the provisions of section 11(e) [sic].[13] That decision of the district court is in turn appealable, and it can be taken to the court of appeals and to the Supreme Court of the United States." The testimony of Mr. Milton H. Cohen, a former Director of the Public Utilities Division of the SEC, at the same hearings is peculiarly telling on the point at issue. He stated that a federal district court, when called upon to enforce a plan pursuant to the provisions of Section 11(e), "on the basis of the record made before the Commission, holds full hearings on the plan, including briefs and oral argument, and then such court has the *independent duty* of determining whether the plan is fair and equitable and appropriate to effectuate the provisions of section 11(b)." *Ibid.* at p. 962.

The 10th Annual Report to Congress of the SEC, April 21, 1945, at pp. 91, 92 and 93, states after making reference to the respective functions of the Commission and the district courts, "Thus security holders have the protection of findings as to the

---

13 It is probable that the "(e)" is a typographical error and the reference was to subsection (b).

fairness and equity of plans by both the Commission and a United States district court", and "As has been said, security holders are not required to accept Section 11(e) plans unless they are found fair and equitable by both the Commission and a United States district court."

▪ Turning now to the internal evidence contained in the Act itself as to the intent of Congress respecting the functions of a district court of the United States in an 11(e) proceeding, we find that subsection (e) lays upon the Commission in the first instance the duty of finding a plan, as submitted or as modified, "necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan * * *." The same subsection provides that the court " * * * shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of this section * * *." The words employed respecting the respective duties of Commission and court are so alike that we must conclude that Congress intended to lay substantially the same duty on the court in the second instance as it imposed on the Commission in the first. Surely, had Congress intended that the district courts of the United States should exercise only the function of review, other and more appropriate language would have been employed. The duty of determining whether the plan is fair and equitable imposed on the district courts in its field apparently is very similar to that which devolves on the Commission itself within the latter's own province. We use the word "field" advisedly for of course limitations on the functions of the court in the exercise of its equity powers are imposed by the Act. These will be discussed at a later point herein. But one may not presume that the same words employed in a single subsection of a statute have dissonant meanings. It is conceded that the Commission must exercise an independent and plenary judgment in passing on the fairness and equity of the plan. Why then must it not be concluded that it was the Congressional intention that the district courts of the United States should do the same *in their own field?*

▪ Subsection (e) goes on to employ the phrase that "the court *as a court of equity* may * * * take exclusive jurisdiction * * * of the company * * * and the assets thereof" for the purpose of effectuating the plan. We do not believe that it was the intention of Congress to cause a district court of the United States to function as a court of equity after it had approved a plan and not to function as a court of equity for the approval or disapproval of the plan. We think that Congress employed the phrase "as a court of equity" classically, intending to require the district courts in Section 11(e) proceedings to exercise in connection with the approval or disapproval of a plan the traditional powers of a court of equity in deciding that justiciable issue; that is to say, to administer justice in the traditional manner of a court of equity. The history of the law of reorganizations supports this view as will be demonstrated hereinafter.

It is also interesting to observe that the last sentence of subsection (b) of Section 11 provides: "Any order made under this subsection shall be subject to judicial review as provided in · section 24." The words are apt for creating a review function in the circuit courts of appeals. Contrast the language employed in subsection (e) which we have quoted above. Section 24(a) of the Act which, as indicated, sets up a means of reviewing the orders of the Commission by the circuit courts of appeals, provides that "The findings of the Commission ·as to the facts, if supported by substantial evidence, shall be conclusive." 15 U.S.C.A. § 79x(a). This sentence or its equivalent is notably absent from Section 11(e).

▪ It must be pointed out also that the Section 11(e) court may hear the application for approval of the plan only "after notice and opportunity for hearing" to those who may be affected by it. It is necessary therefore that notice be given in the proceeding to all security holders who may be affected in order that they may have the opportunity to be heard. Many, if not most, of these persons will not have appeared before the Commission. It was the manifest intention of Congress to give all persons who might be affected by the

plan a day in court in an equity proceeding. If it should appear during the course of a proceeding in the Section 11(e) court that the record furnished by the Commission has grown "stale" for any reason, the court may "remand" the record to the Commission for the taking of further testimony and for reconsideration of the pertinent issues. This course was suggested in In re Midland United Co., D.C.Del., 58 F. Supp. 667, 683. If during the hearing before the district court proof is submitted that cogent evidence has not been submitted to the SEC, the Section 11(e) tribunal may send the record back to the Commission to the end that the latter may take such further testimony as may be required and for reconsideration of the pertinent issues and for new recommendations respecting the plan of reorganization. The proceedings before the equity reorganization court are not strictly *de novo* since the district court can only approve a plan when it has been approved by the Commission. See Application of Securities and Exchange Commission, D.C.Del., 50 F. Supp. 965, 966. This does not mean, however, that the Section 11(e) court may not receive evidence *aliunde* the Commission's record respecting the fairness and equity of a plan. It may decide upon the new evidence and that contained in the Commission's record that the plan is unfair and inequitable and remand the proceeding to the Commission for further consideration; or it may remand without taking new evidence, pursuing the course outlined at an earlier point in this paragraph.

It seems improbable to us that Congress intended that the district courts of the United States should be limited to the function of mere review under the Public Utility Holding Company Act, the only federal reorganization statute by the terms of which security holders are not permitted to vote their approval or disapproval of a proposed plan of reorganization and to prevent its operation if the holders of the requisites amounts of the securities affected are not in favor of it.

The history of the law of reorganizations tends to support the view that a Section 11(e) court must function as an equity reorganization tribunal. Equity receiverships first were employed to effect corporate reorganizations. The powers of the courts of chancery were exercised to make certain that creditors and security holders were treated fairly and equitably. The powers of the court were in nowise circumscribed.[14] While corporate insolvency, sometimes technical, was made the usual touchstone of jurisdiction, when jurisdiction had been secured the court functioned with the plenary powers of a court of equity. Later, the reorganization of insolvent corporations was effected under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The district courts of the United States then had to determine as courts of equity whether the plan was "fair and equitable and does not discriminate unfairly in favor of any class of creditors or stockholders, and is feasible". When Chapter X, 11 U.S.C.A. § 501 et seq., supplanted Section 77B the district courts were required to find, if approval was to be given to a plan of reorganization, that it was "fair and equitable, and feasible". There can be no question but that district courts of the United States in approving or disapproving a plan of reorganization for a company not within the purview of the Public Utility Holding Company Act submitted in a 77B or a Chapter X proceeding are required to exercise their full and independent equity powers in the classic pattern of reorganization courts. This was recognized by the Supreme Court in Vanston Committee v. Green, 329 U.S. 156, 165, 67 S.Ct. 237, 241, wherein Mr. Justice Black stated: "A Chapter X or § 77B reorganization court is just as much a court of equity as were its statutory and chancery antecedents."

If the company to be reorganized pursuant to the provisions of Chapter X is a public utility holding company within the purview of the Public Utility Holding Company Act the proposed plan of reor-

---

14 For classic examples of the application of tests by a court of equity see the decisions of the Court of Chancery of Delaware in Hauer v. Appalachian Gas Corp., 19 Del.Ch. 283, 167 A. 839, and in Eastern States Public Service Corp. v. Atlantic Public Utilities, Inc., 17 Del. Ch. 338, 156 A. 214.

ganization must be submitted first to the SEC under Section 172 of the Bankruptcy Act, 11 U.S.C.A. § 572, and the Commission must first find it to be fair and equitable before it may be submitted to a district court for the latter's approval. When the Commission has found the plan to be fair and equitable and it is then submitted to a district court, that tribunal, if it is to find the plan to be fair and equitable, must exercise its independent judgment pursuant to Section 174 of the Bankruptcy Act, 11 U.S.C.A. § 574 in arriving at such a conclusion. The District Court of Delaware so held, by the present writer, in In re Midland United Company, supra, at page 683 of 58 F.Supp. In the cited case it was pointed out, however, that Section 172 of the Bankruptcy Act provides that the report of the Commission on the plan "shall be advisory only". The section cited was added to the Bankruptcy Act by Congress on June 22, 1938, c. 575, Section 1, 52 Stat. 840, almost three years after the effective date of the Public Utility Holding Company Act. The inference is possible in view of the proviso of the later statute that Congress had intended in respect to a proceeding arising under Section 11(e) of the Public Utility Holding Company Act that a report on the plan by the SEC should be more than "advisory" to a district court passing on the fairness and equity of the plan. It is very clear both from the express language of Section 172 and from its legislative history what Congress intended the functions respectively of the Commission and the court to be in the bankruptcy proceeding. See the Senate Report accompanying the bill.[15]

In providing means for the reorganization of railroads Congress in enacting Section 77, subs. d and e, 11 U.S.C.A. § 205, subs. (d) and (e) provided that the Inter-state Commerce Commission should certify the plan of reorganization with a transcript of the proceedings before it and its order to the appropriate district court which, after notice to the parties in interest, and hearing, shall approve the plan if, inter alia, the court is satisfied that the plan is "fair and equitable * * *." Subsection d provides that the plan shall not be approved by the court unless it has first been approved by the Commission. We are of the opinion that Congress intended the district courts of the United States, within the limitations of the statute, to function as equity reorganization courts. Though the Commission must make the primary determinations respecting the plan, including in particular those relating to valuations of railroad securities, the court must exercise its own independent judgment in approving or disapproving the plan whether the court's rulings relate to value or to some other pertinent subject. See In re Erie R. Co., D.C., N.D.Ohio, 37 F.Supp. 237, 243-245, affirmed, 6 Cir., 133 F.2d 730, certiorari denied 320 U.S. 748, 64 S.Ct. 51, 88 L.Ed. 444. In Palmer v. Massachusetts, 308 U.S. 79, 87, 60 S.Ct. 34, 38, 84 L.Ed. 93, the Supreme Court, by Mr. Justice Douglas, said that the judicial process in bankruptcy proceedings under Section 77 is brigaded with the administrative process of the Commission. The Court also stated that "* * * the whole scheme of § 77 leaves no doubt that Congress did not mean to grant to the district courts the same scope as to bankrupt roads that they may have in dealing with other bankrupt estates." We think that the limitations imposed by the statute are largely procedural, operative in the respective fields specified by Congress to Commission and court, and do not substantially circumscribe the general equity jurisdiction of the reorganization tribunal.

---

[15] S.R.1916, 75th Cong. 3d sess. p 30, states that "Section 172 provides the courts with the administrative assistance of the Securities and Exchange Commission in the complex and difficult task of examining plans of reorganization. It contemplates that after the hearings provided in 169 or 170 the number of practicable plans will be reduced to one or two in number. At this stage it is required that the court shall in cases where the debtor's scheduled indebtedness ex-ceeds $3,000,000 refer the plan or plans which it regards as worthy of consideration to the Securities and Exchange Commission for examination and report. In cases involving a scheduled indebtedness which is less than $3,000,000, such plans may be referred to the Commission. In either case the Commission's reports are advisory only. There is no division of jurisdiction. Ultimate approval or disapproval of plans is left solely with the judge."

Whether the reorganization is to be consummated by way of equity receivership, by action under Section 77B, by suit under Chapter X, by a proceeding under Section 77 or by petition to a district court under Section 11(e) of the Public Utility Holding Company Act, the critical phrase employed alike by courts of equity and by Congress in framing the test under which a plan shall be approved or disapproved, has always embraced the phrase "fair and equitable" or its substantial equivalent. In the light of this very pertinent circumstance we cannot think that the powers and functions imposed on the district courts of the United States vary much from statute to statute and from case to case. If the proceedings be any one of those enumerated in the foregoing sentence a district court must function as an equity reorganization tribunal with the powers and functions of such a court, and not as a mere review court.

Insofar as we are aware the Commission in this circuit prior to the instant case has not taken the position that a Section 11(e) court (any proceeding under Section 77B or Chapter X aside) is not an equity reorganization tribunal but serves only as a court of review. The instant case aside the learned District Judge has passed on twenty-seven reorganization plans brought to the District Court of Delaware by the Commission pursuant to Section 11(e).[16] The former position of the Commission as demonstrated in this circuit and that which the court below has always taken is set out accurately in the opinion in In re Interstate Power Co., supra, at page 168 of 71 F.Supp., as follows: "Since one of the earliest cases for federal district court enforcement under the Act was brought to me for consideration and approval, it has been consistently conceded by all parties, including the various sets of attorneys for the SEC, in this and in all other cases brought to the enforcement court, that a § 11(e) court has the affirmative and independent duty to consider and find whether a proposed plan is fair and equitable * * *."

There are decided cases which look the other way and these are entitled to great consideration. See Lahti v. New England Power Ass'n, 1 Cir., 160 F.2d 845, 858, and Massachusetts Mutual Life Ins. Co. v. S. E. C., 8 Cir., 151 F.2d 424, 430, affirming In re Laclede Gas Light Co., D.C. E.D.Mo., 57 F.Supp. 997, 1004. In the Laclede case Judge Hulen said, "The Com-

---

[16] S.E.C. cases decided by opinion by Judge Leahy, sitting in Section 11(e) proceedings:

American Gas & Power Co., D.C., 55 F.Supp. 756; Homewood v. Standard Power, D.C., 55 F.Supp. 100; Illinois Iowa v. North American Co., D.C., 49 F. Supp. 277; Standard Power & Light, D. C., 48 F.Supp. 716; United Public Utilities, D.C., 52 F.Supp. 975; North Continent Utilities, D.C., 54 F.Supp. 527; Consolidated Electric, D.C., 55 F.Supp. 211; United Gas Corporation, D.C., 58 F.Supp. 501; United Light & Power, D. C., 51 F.Supp. 217, Affirmed 3 Cir., 142 F.2d 411, Affirmed 323 U.S. 624, 65 S. Ct. 483, 89 L.Ed. 511; Standard Gas & Electric, D.C., 59 F.Supp. 274, reversed 3 Cir., 151 F.2d 326; Standard Gas & Electric, D.C., 63 F.Supp. 876. On remand Central States Power & Light, D. C., 58 F.Supp. 877; North Continent, D. C., 61 F.Supp. 419; Central & South West Utilities Co. and American Public Service, D.C., 66 F.Supp. 690; Interstate Power Co. and Ogden Power Corporation, D.C., 71 F.Supp. 164; Community Gas and Power Co. and American Gas and Power Co., D.C., 71 F.Supp. 171; In re Cities Service Co., D.C., 71 F.Supp. 1003; In re Illinois Power Co., North American Light & Power, The North American Co., D.C., 74 F.Supp. 317; Central States Power & Light Corp., Central States Utilities Corp., Ogden Corp., D.C., 74 F.Supp. 360; S.E.C. cases decided without opinion by Judge Leahy: In the Matter of The United Corporation, et al.; In the Matter of Columbia Oil & Gasoline Corp. and Columbia Gas & Electric Corp. (C.A. 288); In the Matter of Columbia Oil & Gasoline Corp. (C. A. 280); In the Matter of Republic Service Corporation and subsidiary companies; In the Matter of American Utilities Service Corporation; In the Matter of Peoples Light & Power Company and Texas Public Service Co.; In the Matter of Crescent Public Service Co., Central Ohio Light & Power Co., Colorado Central Power Co., and Empire Southern Service Co.; In the Matter of East Coast Public Service Co., Virginia East Coast Utilities, Inc., Tidewater Electric Service Co.; In the Matter of North American Gas & Electric Co.

mission found that the plan was 'entirely appropriate' to comply with its orders. These are matters peculiarly within the discretion and power of the Commission, and if based on evidence, we deem this Court bound by the finding." But in *Commonwealth & Southern Corp. v. Securities and Exch. Com'n*, 3 Cir., 134 F.2d 747, 753, this court took the position that stockholders, whose rights were affected by an order of the Commission directing a public utility holding company to change its corporate structure, had a right to a full hearing in the district court of the United States in which the Commission was seeking approval of the reorganization plan. In our decision in In re Securities and Exchange Commission,[17] 3 Cir., 142 F. 2d 411, 422, citing Southern Corp. v. Securities and Exch. Com'n, supra, respecting the necessity for full hearing before the district court, we stated that: " * * * stockholders whose rights were affected by an order of the Commission directing a public utility holding company to change its corporate structure had a right to be heard in that District Court of the United States in which the Commission was seeking to effect its order; that otherwise those stockholders would be deprived of property without due process of law. It follows that the proceeding before the District Court cannot be deemed to be a summary one. Moreover, the fact that notice is to be given to persons affected by the plan shows that the theory of submission to the District Court is substantially similar to that required in respect to a plan made pursuant to the provisions of Section 77B or Chapter X of the Bankruptcy Act." We conclude that the issues which may be presented to the district court are limited only by the terms of the statute. Any question which goes to the issue of what is fair and equitable may be raised and must be passed upon. Reference also is made to the concurring opinion in Lownsbury v. S. E. C., 3 Cir., 151 F.2d at page 219. Cf. In re Standard Gas & Electric Co., 3 Cir., 151 F.2d 326, 331, in which, however, the question here presented was not in focus. See the decision in Okin v. S. E. C., 2 Cir., 145 F.2d 206, 207,

wherein it was stated, "The provisions of § 11 compel full review of an order * * * [of the Commission approving a plan of reorganization] in a district court for all parties in interest * * *." The Court of Appeals for the Second Circuit was of the opinion in the Okin case that an order of the Commission approving a plan of reorganization was purely interlocutory in nature while that of the district court approving the plan was the effective or final order.

The decision of the Supreme Court in the second Chenery case, supra, as has been indicated, is heavily relied on by the Commission. But that decision must be read in the light of the circumstances of the cited case. The proceeding was under Section 24(a) of the Public Utility Holding Company Act. While reference was made to Section 11(e) in the course of Mr. Justice Murphy's opinion, 332 U.S. at page 208, 67 S.Ct. at page 1583, it was not held that the proviso of Section 24(a), "The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.", should be read into Section 11(e). The Supreme Court was not passing in any way on the powers and duties of a Section 11(e) court. In the Chenery case the Court had before it questions relating to a rule of conduct prescribed by the Commission in the course of "[its] ordinary administrative action". The Court stated that its duty of examination is at an end " * * * when it becomes evident that the Commission's action is based upon substantial evidence and is consistent with the authority granted by Congress. * * *" 332 U.S. at page 207, 67 S.Ct. at page 1582. The Chenery decision in our opinion cannot be deemed to be controlling in the case at bar.

We are of the opinion that a Section 11(e) court must exercise its full and independent judgment as to the fairness and equity of the plan. In stating this we do not mean to imply that Congress intended to grant a Section 11(e) court the same full and untrammeled scope that a court of bankruptcy would have in a Chap-

[17] The United Light & Power Company case. Decided by the Supreme Court sub. nom. Otis & Co. v. S.E.C., 323 U.S. 624, 65 S.Ct. 483, 89 L.Ed. 511.

ter X proceeding. For analogy see Palmer v. Massachusetts, supra. The SEC must make sure that the plan of reorganization fulfills the purposes of the Act, must value the securities involved in the plan and must decide in the first instance whether the plan is fair and equitable. The court may not pass on a plan until it has been approved by the Commission and cannot approve a plan which has not been approved by the Commission. The court may not substitute its valuations for those of the Commission but it may reject valuations made by the Commission in fulfilling its, the court's, statutory function in determining whether the plan is fair and equitable. The court of course may not act capriciously in rejecting valuations made by the Commission nor may the Commission act with caprice in valuing securities. The judicial process is brigaded with the administrative process of the Commission but this does not mean that the court in the field allocated to it by Congress is not to exercise its independent plenary judgment as an equity reorganization tribunal upon every matter relating to the fairness and equity of the reorganization.

In the light of the foregoing we cannot hold, as the Commission contends we must, that unless the conclusions of the Commission lack rational or statutory foundation they may not be disturbed by the Section 11(e) court, or that a reversal of the Commission's judgment by the court may not be effected save where the Commission has plainly abused its discretion. We conclude that it was the duty of the court below to function as an equity reorganization tribunal within the limitations prescribed by the Act. The findings and conclusions of the Commission were not binding upon the learned District Judge, though, as was proper, he treated them with respect. He weighed the numerous elements involved in the case, albeit on his own scales, and in the exercise of his independent judgment, arrived at the conclu-

sion that the plan was not fair and equitable. The examination made by the District Court of the relevant factors was careful and far-reaching. The District Judge attached substantial weight to elements or factors which the Commission apparently did not deem to be of importance. For example, he laid emphasis on the market and dividend histories of all the securities and the losses which were indubitably occasioned to the holding company enterprise by the sale of securities from Engineers' portfolio because of the divestitures required by the Act. Neither the Commission nor the court, in what we consider to have been a proper application of one of the principles enunciated by the Supreme Court in Otis & Co. v. S. E. C., (The United Light & Power Co. case) 323 U.S. 624, 637, 65 S.Ct. 483, 89 L.Ed. 511, treated the charter provisions of Engineers as dispositive of the issues presented. While the court deemed the liquidation of Engineers to be an involuntary one and pointed to decisions[18] where, under charter provisions similar to those of Engineers no premium was allowed, he treated the involuntary liquidation provision of Engineers' charter as but one factor to be employed in determining the values of the preferreds. The Commission for its part treated the "call" provisions of Engineers' charter only as "stoppers" to prevent the "investment values" of the preferreds from exceeding the premium or call prices. But the weight and emphasis applied by the court and the Commission to the various factors in the case go, we think, to the two respective primary considerations which brought the Commission to a conclusion that the plan was fair and equitable and the court to a finding that it was not.

The reasoning which moved the Commission is not as plain as it might be. But we think it is clear that it did not give any substantial consideration to the future earning power of Engineers and its subsidiaries which the Supreme Court has held is one of the fundamental tests for reor-

---

[18] See the cases cited in note 6 supra. See also City National Bank & Trust Co. v. S.E.C., 7 Cir., 134 F.2d 65; Massachusetts Mutual Life Insurance Co. v. S. E.C., 8 Cir., 151 F.2d 424, certiorari denied 327 U.S. 795, 66 S.Ct. 817, 90 L. Ed. 1022; In re Standard Gas & Electric Co., 3 Cir., 151 F.2d 326; and New York Trust Co. v. S.E.C., 2 Cir., 131 F.2d 274, certiorari denied 318 U.S. 786, 63 S. Ct. 981, 87 L.Ed. 1153.

ganization valuation. See Consolidated Rock Products Co. v. Dubois, 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed. 982, and Group of Investors v. Milwaukee R. Co., 318 U.S. 523, 565–566, 63 S.Ct. 727, 87 L.Ed. 959. In the instant case the Commission made no attempt to ascertain the future earning power of the system nor to apportion earning power between the preferreds and common based on their respective claims to income as it did in The United Light & Power Company case. But if values for the securities are to be determined *ex* the Act it is clear that the Commission should have done so. What the Commission has done is to consider the investment values of the preferreds *ex* the Public Utility Holding Company Act, i. e., as if the Act had never been passed. But it considered only the preferreds on this basis. It seems to have omitted consideration of the common by a similar standard. It made no finding as to the "value" of the common stock. The Commission's action may not be upheld merely because such a finding possibly could have been made. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." See Securities Comm'n v. Chenery Corp. (the first Chenery case), 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626. "There is no such finding here." 318 U.S. at page 94, 63 S.Ct. at page 462. Under the plan the common stock is excluded from the holding company enterprise as effectively as are the preferreds for the common under the plan will receive participation only in operating companies. The fact is that the holding company enterprise is at an end, both for preferreds and common. The Commission apparently has disregarded this fact which supplies the substantial difference between the instant case and The United Light & Power Company reorganizations. In the latter case the security holder participation in the enterprise was shifted from the top holding company to a subsidiary holding company but the holding company enterprise as such continued. In the instant case the Commission ascribed "investment value" to the preferreds but failed to make a similar approach to the common. The result is

that the Commission has attempted to value the securities of Engineers both *ex* the Act and *intra* the Act. We have used the phrase "attempted to value" advisedly for we think that in the employment of the formula of "investment value" the Commission erred in the light of the decision of the Supreme Court in the Otis & Co. case for the reasons set forth at a later point in this opinion. The court refused to approve the Commission's action deeming it to embrace an improper exercise of the Commission's administrative discretion. In determining whether the plan was fair and equitable the court valued the securities *ex* the Act, considering the holding company enterprise to be at an end as it is in fact.

The anomaly of the Commission's general position is made all the more apparent, we think, by its failure to consider the substantial losses which occurred to Engineers by virtue of divestitures compelled by the Act. The loss in Puget Sound Power & Light Co. stock will serve as an example. The Commission allowed to Engineers only 3% of Puget Sound's new common stock in exchange for 99.3% of the old common stock. The allocation was based on the Commission's determination that the future earning power of Puget Sound available for the stocks would lie somewhere between $2,657,000 and $3,083,000. See Puget Sound Light & Power Co., 13 S.E.C. 226, 243–244. The net profits from the stock of Puget Sound in 1946 were $5,325,320 and for the twelve months ending June 30, 1947, were $5,067,410.[19] Another instance of loss to Engineers by reason of divestiture compelled by the Act lies in Engineers' disposition of its interest in El Paso Natural Gas Company. Under this divestiture Engineers lost a profit of at least $4,000,000. We desire to make it clear that we do not criticize, or even suggest criticism of, the Commission because of its orders compelling these divestitures which were required by the Act. Hindsight demonstrates facts which foresight, however apt or well-informed, may not be able to foretell. But if the Commission is to make valuations *ex* the Act in respect to the preferreds, it must do likewise in respect to the common. The difficulty with the Commission's position in

---

[19] See Moody's Public Utility Manual (1947) at p. 53 and Suppl. Vol. 19, at p. 1914.

this connection, the formula of "investment value" aside, lies in the fact that while it has attempted to appraise the preferreds (as distinguished from the common) *ex* the Act its basis of valuation, insofar as it has composed one, lies in factors which have come to existence because of the impact of the Act. Paradoxically, though the paradox is more apparent than real, if the equitable equivalents for relinquished securities are to be arrived at by the Commission under the doctrine of the Otis & Co. case, *ex* the Act, losses of the sort referred to in this paragraph must be weighed into the calculation, i. e., such losses should be returned to the credit side of the enterprise's balance sheet as a matter of bookkeeping.

The selection of possible though varying techniques is for the Commission in the exercise of its expert administrative judgment. But whatever technique is chosen it must be employed consistently throughout the entire operation of valuation. We do not say the Commission must approach the problem *intra* the Act or *ex* the Act as the Commission purports to have done in the instant case. Either course consistently followed could, we think, lead to just and appropriate valuations. No particular, specific approach is to be nailed to the Commission's head. The Commission must, however, approach the problem of valuation with a full view of all the pertinent factors employing the same scales and the same measure throughout.

In conclusion upon this point we state that in our opinion the Commission in attempting to apply the "investment value" test to the Engineer's preferreds, even to the limited extent hereinbefore indicated, has misunderstood the principle of "equitable equivalents" enunciated by the Supreme Court in the Otis & Co. case. We can perceive no reason why the doctrine of equitable equivalents cannot include within its ambit cash for securities as well as securities for securities. Perhaps, strictly speaking, cash is not an equitable equivalent for securities. But cash certainly may be an adequate recompense for the security relinquished and if it be a just recompense,

the exchange will be equitable. In the Otis & Co. case the Supreme Court held that a distribution of assets might be made between different classes of securities without dollar valuation if each security holder received the equitable equivalent of what he had surrendered. 323 U.S. at pages 639, 640, 65 S.Ct. at pages 490, 491. We do not understand, however, that the principle of the Otis & Co. case would preclude giving the security holder money in lieu of his security if the cash which he would receive would be just recompense for the security which he would give up. We conclude, therefore, that the doctrine of equitable equivalents may properly be applied where money is to be given for securities and where securities are to be allocated for securities as in the instant case. The difficulty in sustaining the Commission's position in respect to "investment value", even insofar as the Commission has applied that value, lies in the fact that investment value is and can be only *one* of a series of factors to be used in arriving at equitable equivalents. We conceive that the Commission could make a finding under certain circumstances that investment value was the equitable equivalent to the security holder. The Commission in the instant case, however, has not made such a finding and we do not believe that such a finding could be supported on the present record. In determining equitable equivalents the Commission must weigh all pertinent factors to the end that the security holder may receive as nearly as may be the equivalent of that which he is giving up. All pertinent factors and all substantial equities must be considered by the Commission whether equitable equivalents are to be reached by the approach *ex* the Act or the approach *intra* the Act. The new doctrine of investment value presently urged by the Commission may not be substituted for the doctrine of equitable equivalents enunciated in the Otis & Co. decision.

For the reasons stated we conclude that the District Judge did not err when he found that the plan as submitted by the Commission was unfair and inequitable.

Certainly we cannot say that this conclusion was clearly erroneous.[20]

■ Though a district court of the United States sitting pursuant to the provisions of Section 11(e) may reject a plan, it cannot value the securities, find equitable equivalents therefor and substitute its own estimates for those of the Commission requiring the plan as amended by it to be carried out. To put the matter briefly, a district court may reject but not amend the plan. The court below, therefore, erred in one particular. It entered an order approving and enforcing the plan as amended by it. It was without power to do this. The provisions of Section 11(e) make it clear that the Commission in the first instance must approve the plan and find it to be fair and equitable. If, as here, the district court disagrees with the conclusion of the Commission that the plan is fair and equitable, it must refuse to approve the plan and "remand" the record to the Commission for further and appropriate action by it.

The action which the Commission may take will, of course, be limited by the fact that with its approval, evidenced by its opposition to the appellant Streeter's motion to stay which this court denied, the plan has been carried into effect, with the exception of the payment of the premiums which the district court disapproved. Under the escrow agreement which the Commission approved funds which are sufficient to pay all or any part of these premiums have been withheld from distribution, however, and the escrow agreement accordingly delimits the area in which the plan to be approved by the Commission and district court must fall. The problem is and will remain, until its disposition by the Commission, one of valuation of the securities of Engineers, viz., the preferreds and the common.

■ The escrow provisions of the plan are proper in our opinion. The objections asserted thereto need not be discussed in this opinion.

The decree of the court below is vacated and the cause is remanded with the direction to enter an order disapproving the plan as not being fair and equitable within the purview of Section 11(e) of the Public Utility Holding Company Act, and to return the record to the Commission to the end that it may take such action as the facts and the law may require.

### On Petitions for Rehearing and Answers Thereto

■ Petitions for rehearing, answers thereto, and cross-petitions for rehearing have been filed in these cases. The petition of the Commission by Note 1 asserts that if the Commission is bound by the District Judge's determination "as to amount" to be paid to the preferred stockholders of Engineers "no remand to the Commission would be necessary, because the Commission [by its amendatory order of February 11, 1947] has already contingently approved an alternative allocation of cash to preferred stockholders at the amount of the liquidation preference if as a result of the processes of review in the District Court and on appeal therefrom this should be judicially determined fair and equitable." The cross-petitions assert that the proceedings should not be remanded to the Commission for a somewhat different reason, specifically because by the amendatory order referred to the Commission approved payment to the preferred stockholders of $100 per share, and of any additional amounts which might be

---

[20] Judge Leahy's opinion is entitled to especial weight by virtue of his familiarity and experience with Section 11(e) proceedings and plans of reorganization under the Act. See R.F.C. v. Denver & R.G.W.R. Co., 328 U.S. 495, 533, 66 S.Ct. 1282, 90 L.Ed. 1400, and Rule 52, F.R. C.P., 28 U.S.C.A. following § 723c.

We are informed by the Chief of the Bureau of Procedural Studies and Statistics of the Administrative Office, United States Courts, that up to February 11, 1948, the Securities and Exchange Commission had filed 63 petitions in the District Courts of the United States, seeking approval of plans of reorganization pursuant to Section 11(e) of the Public Utility Holding Company Act and that 27 of these had been filed in the District Court of the United States for the District of Delaware. See also note 16 supra. Approximately forty-two percent of all plans of reorganization submitted by the Commission under Section 11(e) to the District Courts of the United States, therefore, have been submitted to Judge Leahy in the court below.

decreed "by the District Court of any appellate court * * *". It is also pointed out by the cross-petitions that the Commission approved the terms of the escrow agreement and joined in presenting it to the court below for an appropriate order and also that counsel for the Commission before the District Court indicated his belief that those portions of the plan of reorganization which were not subject to attack, should be carried out as has been done.

We are not unmindful of the delay, perhaps of short duration, which necessarily must ensue upon the return of the record to the Commission pursuant to our decree but we are of the opinion that neither the Commission, nor the District Court, nor this court possesses the power to waive the provision of Section 11(e) providing for approval of a plan of reorganization as fair and equitable by the Commission and by the District Court. Moreover, we cannot treat the Commission's amendatory order of February 11, 1947 or its approval of the escrow agreement as a rejection of the role imposed on the Commission by Congress. The correctness of our position in this regard is demonstrated by the fact that the amendatory order of the Commission provides that the escrow agent may make payment to the preferred stockholders only when the order of the District Court has become final and not subject to appeal. What the Commission intended to effect by the order was nothing more than the establishment of a means for expediting the execution of the plan of reorganization when the approval required by the statute had been attained.

The Commission approved the plan as amended by it, requiring amounts equivalent to redemption premiums to be paid to the preferred, finding this to be fair and equitable. Thereafter it presented the plan to the District Court. The District Court found the plan to be unfair and inequitable and rejected it. We affirmed that decision for the reasons stated in our opinion. The Commission must now proceed to a reconsideration of the problems presented in the light of our opinion or procure the review thereof by the Supreme Court.

The loss which will occur to the common stockholders by reason of the remand may be lessened to some extent by appropriate investment of the escrow fund. An order will be entered authorizing the court below to take appropriate action on an application for investment of the fund, if such be made to it.

Other questions raised by the petitions for rehearing do not require discussion. Orders will be entered denying the prayers of the petitions and of the cross-petition.